UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:22-cv-00151-RGJ-CHL

MARIANA LEMIEUX                                          PLAINTIFF

v.

LOUISVILLE METRO GOVERNMENT                              DEFENDANT

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Comes the Defendant, Louisville Metro Government ("LMG"), by counsel, and for its Memorandum in Support of Motion for Summary Judgment states as follows:

**INTRODUCTION**

Beginning in 2001, Plaintiff, Mariana Lemieux ("Lemieux") worked for LMG a social worker.  In 2016, Lemieux received counseling for her failure to timely submit case reports which jeopardized her clients' participation in housing programs.  After being given three months to cure the deficiencies, Lemieux remained unable to complete the work, and was given a three-day suspension.  She admitted that disciplinary action was warranted.  Unfortunately, the issue persisted for the next six months.  Her supervisors continued to work with her and provide her assistance in time management, however, Lemieux still fell behind on her case reports and was again disciplined.

After falling behind in her work, and during this disciplinary process, Lemieux applied for disability accommodations related to a recent diagnosis of ADHD.  She asked for an accommodation of "clear expectations communicated and clear deadlines for tasks which would bring a consequence of disciplinary action."  In this request, she also acknowledged that she was to be "held to the same standards as any other Senior Social Worker."  Lemieux admitted, however, that this was not a request for an accommodation for her diagnosis of ADHD, but rather, a

complaint that her supervisor gave her "contradictory" instructions causing her confusion. Candidly, Lemieux admitted that her impairment did not prevent her from understanding the expectations of her job (including the need to submit reports on time) or that the failure to do so could result in disciplinary action.

In the process of applying for accommodations, Lemieux's physician recommended "extra time" to complete tasks, "if needed." Human resources engaged in the interactive process to clarify this recommendation. After this conversation, Lemieux submitted a second doctor's note in which she informed human resources that she and her physician decided ***not to*** seek extra time or any accommodations, and instead would try to resolve her issues directly with her supervisors. Lemieux testified that she did not believe that the "extra time" was what she "needed" to address her ADHD. As a result, human resources closed the accommodation request.

After failing to cure the deficiencies, LMG demoted Lemieux. She again admitted to her inability to meet expectations and that discipline was warranted. In her new role, Lemieux submitted a second application for accommodations. In addition to the initial request for "clear communications," Lemieux asked for a timer to keep her on task during client meetings, a "written daily routine," a "wall calendar," the ability to close her office door, and the ability to come in a half hour later in the morning. None of these requests other than the change in schedule required any action on the part of LMG. Nevertheless, all were granted.

A year later, Lemieux applied for and received a promotion back to the Senior Social Worker position from which she was demoted. With accommodations still in place, six months into the position, she again fell behind on case reports. In order to "save her job," Lemieux applied for additional accommodations. She did so because she "did not want to be written up or be penalized due to" her inability to timely complete her work. This time, she asked for "support"

2

from her supervisor to help her write the case reports in a more efficient manner so that she would not get behind on work, a timer to use with client meetings, the ability to come in another half hour later in the morning, and "feedback" from her supervisor so that she could "work smarter."  During the pendency of this request, Lemieux was placed on a Performance Improvement Plan to address several deficiencies that predated the accommodation request.  Also during this time, LMG denied the accommodation request with the exception of granting her the use of a timer.  LMG denied the request on the grounds of undue hardship as her requests amounted to shifting her responsibilities to her supervisor, and ultimately would not assist her in performing the essential functions of the job, including submitting the case reports on time.  LMG noted (and Lemieux acknowledged) that she received at least monthly one-on-one sessions with her supervisor in which she was free to ask for feedback on how to "work smarter" or be more efficient in report writing.  In addition, LMG noted (and Lemieux acknowledged) that her supervisor had an open door policy, of which Lemieux took advantage on a daily basis.

When she failed to complete the Performance Improvement Plan, Lemieux received a one-month suspension.  After returning to work, Lemieux created her own "Plan to Stay Caught Up."  This Plan included the tools and strategies suggested by her physician and the accommodations previously granted by LMG (such as the use of a calendar).  Notwithstanding, Lemieux continued to fall behind on case reports and other aspects of her job, and her employment was terminated as a result.

Lemieux brings this action alleging that LMG failed to provide accommodations.  Lemieux, however, cannot sustain her claim.  Lemieux admitted that she was not meeting expectations, and that discipline was warranted.  She only sought accommodations after facing discipline for being behind on her work.  The accommodations she sought were either not related

to her ADHD diagnosis or were unreasonable on their face.  LMG's denial of third accommodation request was warranted under the law because none of the requests would have assisted Lemieux in her time management deficiencies, and further, would have shifted some essential functions to her supervisor.  Consequently, the denial of the accommodations was not discriminatory, and LMG is entitled to judgment as a matter of law.

## STATEMENT OF FACTS

LMG hired Lemieux in 2001 as a Senior Social Worker where she worked as a case manager.  This job included the essential function of maintaining a minimum contact rate with clients, and documenting client updates and status accurately and timely in the software provided by LMG.  (Lemieux depo., at 28-29; 31).  Lemieux had received training on the programs, report writing, important deadlines, and the software to be used in administering the programs.  Lemieux was proficient in using the software.  (*Id.* at 22-24).  In addition, Lemieux was provided with program policies and procedure which outlined the important deadlines associated with her job.  (*See* Policies and Procedures attached hereto as **Exhibit 1**).

In 2016, Lemieux was responsible for supporting clients in securing housing, maintaining housing stability, and maximizing self-sufficiency.  (Lemieux depo., at 35).  This program was funded by HUD, and therefore, LMG provided Lemieux (and all case workers) with procedures necessary to maintain the grant.  (*Id.* at 36, 37).  Several of these policies and procedures contained deadlines upon which reports were due to prevent jeopardizing the client's participation in the housing programs.  (Lemieux depo., at 38-39).  Lemieux understood these policies, and the importance of completing tasks by the deadlines. (*Id.* at 35, 38).

In November, 2016, Lemieux's received a warning for not timely submitting case reports in over 20 cases.  (*See* Disciplinary Action Form attached hereto as **Exhibit 2**).  In some of the

cases, Lemieux failed to timely submit rent payments, resulting in threatened eviction for the clients. (*Id.*). One landlord threatened to cease working with LMG because of Lemieux's performance issues. (*Id.*; *see also* Lemieux depo., at 86). Lemieux had agreed to take steps to complete the cases in three weeks' time, and was provided assistance to do so. (*See* **Exhibit 2**; *see also* Lemieux depo., at 83).

By February, 2017, Lemieux had still not caught up on her caseload despite being given nearly two additional months to complete the work and a warning of the consequences. (*See* **Exhibit 2**). Her supervisor noted that the average case was "3.3 months over due." (*Id.*). As a result, Lemieux's supervisor recommended a three-day suspension. (*See* Letter of Suspension attached hereto as **Exhibit 3**). This letter contained **clear expectations** for when she returned from her suspension, including to complete work in a timely manner, complete at least four cases per day. (*Id.*). To assist her with time management, LMG required Lemieux to attend a Time Management Training session, and suggested that she utilize EAP services provided by LMG if she believed there was a need. (*Id.*).

Over the next six months, Lemieux continued to fail to meet deadlines. In August, 2017, Lemieux was again disciplined for repeatedly submitting reports in an untimely manner. (Lemieux depo., at 122). Just prior to this discipline, in July, 2017, Lemieux was evaluated for ADHD. Dr. Lee Epstein provided Lemieux with a report and recommendations to address her difficulties in "keeping up with the paperwork":

> To use a daily calendar for appointments, commitments, phone calls and personal responsibilities. (Lemieux testified that she was already employing this strategy and did "nothing different" as a result, Lemieux depo., at 92-94).

> To use visual prompts such as colorful notes and placement of items to remind her to do certain things. (Lemieux testified she did not think that she had memory issues, so this was not a strategy she would use, Lemieux depo., at 95).

To place items in the same place every day.  (Lemieux testified she did not think that she needed to not use this strategy, Lemieux depo., at 95-96).

To develop daily rituals and routines.  (Lemieux testified that she chose not to create any daily routines, Lemieux depo., at 97-101).

To read helpful books.  (Lemieux testified that she is not a good reader, and chose not to listen to the audio books.  However, she admitted that maybe she should have read the books, Lemieux depo., at 101-02).

(*See* Evaluation and Recommendations attached hereto as **Exhibit 4**).

In November, 2017, Lemieux continued to have overdue case reports.  Her supervisor again addressed her failure to complete reports on time by asking for a list of all cases that were late, and giving her a deadline her to complete the reports.  (*See* Email dated November 13, 2017 attached hereto as **Exhibit 5**).  In response, Lemieux asked for an extension to complete the work, which was granted.  (*See* Emails dated November 18, 2017 attached hereto as **Exhibit 6**).  Lemieux acknowledged that she was "not on top of it" enough to get the work done.  (*Id.*). Lemieux's supervisor also assisted her in completing her case reports, and provided detailed feedback.  Her supervisor also eliminated one of her job duties.  He allowed her to opt out of participating in new client intake meetings until she got caught up, and further outlined a list of tasks to be completed by January 3, 2018.  (Lemieux depo., at 132-33).  Her supervisor also edited one of Lemieux's case notes, showing her in detail a simpler way to summarize the information, as she had requested. (*See* Email dated January 5, 2018 attached hereto collectively as **Exhibit 7**; *see also* Lemieux depo., at 134-35).

On the eve of receiving discipline for repeated failures to complete case reports on time, on November 13, 2017, Lemieux submitted her first request for an accommodation related to her ADHD diagnosis.  (First Request for Accommodation attached hereto as **Exhibit 8**).  In her application, she defined her limitation as difficulty with "time management, organization, and slower rate of processing cases." The only accommodation she sought was as follows:

I need clear expectations communicated and clear deadlines for any tasks which would bring a consequence of disciplinary action.

I am not asking to do any less than what is required for the job.  I expect to be held to the same standards as any other Senior Social Worker in my position related to job performance.

(*See* **Exhibit 8**).  Notably, Lemieux admitted that her impairment did not affect her ability to understand expectations or LMG policies and procedures.  (Lemieux depo., at 24; 34).  Lemieux was incredibly candid when explaining that the accommodation of "clear expectations communicated" was completely unrelated to her ADHD diagnosis because she knew that she was expected to complete case reports ***on time***.  (Lemieux depo., at 170).  In other words, she did not need an accommodation to understand that her tasks had deadlines, and that the failure to meet those deadlines could result in discipline.  Instead, she clarified that her issue was her supervisor's contradictory instructions:

A.   I think I felt that I was experiencing like different things between what [my supervisor] was saying to me and then what was happening like in writing. To some degree it felt like there was a difference.

Q.   So he was being contradictory of himself?  He was giving inconsistent instructions?

A.   Somehow my expectations were different when I went by what he said than what was in – what came out in writing….[T]he only thing I can think is that we talked so much that I think it got kind of fuzzied up in the – things got confused or lost or didn't – so I don't know exactly how that was going to change but I just said basically I needed clear expectations.

Q.   You needed him to communicate with you differently.

A.   Yeah, I guess that would be fair.

Q.   So how would his communications, a different type of communication affect your ability or your difficulties with time management?

A.   Well, because, again, obviously I'm thinking that were was – like obviously I didn't want to receive disciplinary action so there must have been – I don't remember exactly.

7

(*Id.* at 154-56).   Similarly, the accommodation for "clear deadlines for any tasks which would bring a consequence of disciplinary action" was completely unrelated to her ADHD diagnosis. Lemieux acknowledged that she did not need an accommodation to know that failing to meet deadlines could result in discipline:

> Q.   Did your impairment prevent you from understanding when you could be disciplined?
>
> A.   I would say no.  Yeah, I would say no.  I just think if I understood the communication the way it was maybe it was – but I don't think my disability caused me to interpret it necessarily differently.

(*Id.* at 210).  Indeed, Lemieux ***acknowledged that she had no impairment that prevented her from understanding when there were deadlines***, and was only frustrated with her supervisor's communication style.  (*Id.* at 175).

Dr. Epstein submitted documentation in support of Lemieux's application for accommodations.  (*See* Dr. Epstein Documentation attached hereto as **Exhibit 9**).   He simply stated that Lemieux needs "extra time to complete cases, if necessary."   Lemieux admitted that this documentation was missing some information, and that there may be some tasks that extra time could not be provided due to program deadline restrictions.  (Lemieux depo., at 163).  After receiving Lemieux's documentation, human resources engaged in the interactive process and set up a call to clarify what was meant by "extra time…if necessary."  (Lemieux depo., at 168; *see also* Transcript of January 5, 2018 call attached hereto as **Exhibit 10**).  During this call, Lemieux was unable to articulate what she needed, and in fact, was reluctant to actually ask for extra time as an accommodation:  "I remember telling [my supervisor], she said, well, what do you need, more time to do your notes or more days.  I was like ***I don't know what I need, because I didn't want to ask for that, honestly, because I think something in me said that that's not going to help,***

*its not what you need.*" (Lemieux depo., at 168-69 (emphasis added); *see also id.* at 170; and **Exhibit 10**).   In other words, Lemieux rejected the one accommodation Dr. Epstein suggested because it would not assist her in performing the essential functions of her job.  (Lemieux depo., at 169).   She told human resources that she didn't "want to ask for more time if cases have to be turned in in 11 days.  Caseload numbers, I don't feel like I should have a lower caseload. **I am not sure what accommodations I need**."  (*See* **Exhibit 10** (emphasis added); *see also* Lemieux depo. at 170).  At the end of the call, Lemieux informed human resources that she did not want to ask for any accommodation and would ask her boss to "work with her one day at a time" and to be clear in writing if there is something that would lead to discipline.  (*See* **Exhibit 10**; *see also* Lemieux depo. at 170-71; 172-3).  She asked human resources to hold the accommodation request until she could talk with her physician.  (*See* **Exhibit 10**; *see also* Lemieux depo., at 173-74).  Days later, Lemieux submitted a second doctor's statement:

> It was our decision together that Mariana would try to resolve some of her issues with the assistance of her support supervisors.   Rather than make specific recommendations at this point in time.

(*See* January 17, 2018 Note from Dr. Epstein attached hereto as **Exhibit 11**; *see also* Lemieux depo., at 183-84).  After receiving Dr. Epstein's statement, human resources scheduled a second call with Lemieux, and informed her that the matter would be closed unless she submitted additional documentation.  (*See* Transcript of January 19, 2018 call and follow up letter attached hereto collectively as **Exhibit 12**).

Lemieux's performance did not improve and her supervisors recommended a demotion. (*See* February, 2018 Disciplinary Action Report attached hereto as **Exhibit 13**).  In support of the demotion, Lemieux's supervisor outlined performance deficiencies that existed since November, 2017, and noted that her inability to submit case reports in a timely manner had persisted for over

a year despite being provided support (including removing duties and editing her case notes), and extra time to get the reports completed.  (*Id.*; *see also* Lemieux depo., at 136).  Lemieux admitted that the ADA does not insulate an employee from discipline for performance issues.  (Lemieux depo., at 149-50; 209).

After her demotion, Lemieux submitted a second accommodation request.  In this request, Lemieux asked for similar accommodations (clear expectations and an understanding of when discipline could be imposed, clearly communicated deadlines in writing and reinforced verbally by her supervisor so there is no miscommunication).  (*See* Second Request for Accommodation attached hereto as **Exhibit 14**).  Lemieux again admitted that this was not an accommodation for her disability, but instead a request for better communication from her supervisor.  (Lemieux depo., at 198-99).  She also asked to use a timer to stay "on task."  (*See* **Exhibit 14**).  Her supervisor thought the timer could be "intrusive" in a client meeting, but recommended an alternate accommodation to stay on task in client meetings.  (Lemieux depo., at 197-98).  Dr. Epstein also recommended a "written daily routine," a "wall calendar," the "ability to close her office door to minimize distractions," and a change in her schedule to begin her day at 8:30 instead of 8:00.  (*See* February, 2018 Dr. Epstein Documentation attached hereto as **Exhibit 15**).  Lemieux admitted that most of these accommodations were tools strategies that she could implement herself without any accommodation from LMG.  For example, she did not need anything from LMG to create a daily routine.  (Lemieux depo., at 214-15).  In addition, Lemieux did not ask for a wall calendar because she used a planner instead.  (*Id.* at 216).

Human resources again scheduled a call with Lemieux as part of the interactive process to better understand her second accommodation request.  (Lemieux depo., at 200; *see also* Transcript

of February, 2018 call attached hereto as **Exhibit 16**).   Overall, Lemieux received the accommodations requested.  (*Id.* at 219-21).

One year later, LMG promoted Lemieux back to the Senior Social Worker position. (Lemieux depo., at 223).  Nothing about the ADA process or her request for an accommodation prevented her from obtaining this promotion.  (*Id.*).

Lemieux worked in this position for six months and fell behind on case reports.  When she faced discipline, she submitted her third request for accommodations.  Lemieux explained:

> [M]y understanding was it's best to apply for accommodations before getting disciplined because, like you said, discipline is something they can do – I just didn't want to ask for it off the top because I wanted to just try to work it out.  I thought it was a very – because I had been doing it so long with the case management I just – I don't' know, I just though let me just try….[W]hen I got behind and I knew … that I needed to ask, like I couldn't put it off any longer.  It wasn't about trying to avoid discipline, it was just that I was trying to ask for the accommodations.  I was trying to get myself enough time to work it out and ask for accommodations as a last resort.

(*Id.* at 225-26).

Lemieux submitted this third request for accommodations because "she did not want to be written up or be penalized due to the handling of her workflow."  (*See* Transcript of June, 2020 call attached hereto as **Exhibit 17**).  Despite using the accommodations previously granted by LMG and utilized by Lemieux (the use of a calendar or planner, a written daily routine, etc.), she continued to have difficulty "managing daily tasks or taking longer to do things" than she should. (*Id.*; *see also* Lemieux depo., at 229-31).  Lemieux acknowledged that being behind in her workload amounted to a failure to meet expectations and subjected her to discipline.  (Lemieux depo., at 231).  Lemieux understood that a request for an accommodation could not be used to avoid discipline for failure to meet expectations.  (*Id.* at 230).

In this third request, Lemieux sought vague accommodations: extra "support" from her supervisor to become more efficient in writing case notes, including having her supervisor re-write her notes to better understand what should be included; a visual timer or cell phone application to use while meeting with clients; a change in her start time from 9:00 to 9:30; and "feedback" from her supervisor to aid her in identifying ways to work smarter. (*See* Third Accommodation Request attached hereto as **Exhibit 18**).

Lemieux was subjected to discipline for her failure to complete work on a timely basis, failure to meet monthly client contact rates and document outcomes in the software (some clients had no contact since Lemieux started the job); and failure to provide her supervisor with timely updates, even after extensions were given. (*See* August, 2020 Disciplinary Action Report attached hereto as **Exhibit 19**). These performance issues predated the accommodation request. In this Disciplinary Report, her supervisor noted that she had regular one-on-one meetings with Lemieux, but the performance issues persisted. Lemieux was given clear guidance to improve her performance. (*Id.*; *see also* Lemieux depo., at 242). Lemieux's performance did not improve, resulting in two Performance Improvement Plans. (*See* Performance Improvement Plans attached hereto as **Exhibit 20**). Lemieux acknowledged that she was not meeting expectations and that the Plans were "warranted." (Lemieux depo., at 243, 246). Lemieux blamed part of her inability to meet expectations on her supervisor not providing clear instructions to any of the case workers. (*Id.* at 244). ***This had nothing to do with her impairment***. (*Id.*). This Performance Improvement Plan also set forth clear expectations. (*Id.* at 244-45; 246). While on the Performance Improvement Plan, Lemieux's supervisor met with her at least weekly to assist her in successfully completing the Plans. (*Id.* at 255-56). During those sessions, Lemieux complained that part of

her difficulties resulted from the program manager and her supervisor providing conflicting instructions, which was not related to her impairment.  (*Id.* at 256-57).

In December, 2020,  Lemieux received a separate counseling report to address deficiencies noted in file maintenance and documentation, case notes, and the timely completion of tasks.  (*See* December, 2020 Counseling Report attached hereto as **Exhibit 21**).  She was given clear expectations and goals to address the issues.  (Lemieux depo., at 259).  Lemieux struggled to meet these expectations while on the Performance Improvement Plans which she acknowledged in an email dated January 11, 2021.  Lemieux blamed the deficiency not on her impairment, but rather on having "a lot of clients needing re-certifications which involves more paperwork than typical monthly.  I do not say this as an excuse but just to point out that this is creating a lot more paper work to have complete than would normally be required."  (*See* January 11, 2021 Email attached hereto as **Exhibit 22**).

Lemieux did not successfully complete the Performance Improvement Plan, and failed to meet her goals.  As a result, she received a one-month suspension.  While she was out on suspension, her supervisor completed some of Lemieux's work to help her catch up, but several overdue cases remained upon Lemieux's return to work.  (Lemieux depo., at 271-72).  When she returned from the suspension, Lemieux created a "Plan to Stay Caught Up" which included several of the strategies previously suggested by Dr. Epstein, or strategies approved in her second request for an accommodation.  (Lemieux depo., at 56-60; *see also* Handwritten Notes attached hereto as **Exhibit 23**).  For example, one of Lemieux's ideas to assist in time management was to create appointment slots on her calendar for her tasks.  (Lemieux depo., at 61).  She admitted that she did not need any accommodation from LMG to create appointment slots on her calendar.  (*Id.*).  Similarly, to address time management issues, her plan included a reminder to schedule enough

time between visits to complete all tasks associated with the visits and time to adequately prepare for each visit. (*Id.* at 64-66). She needed no accommodation to be able to schedule enough time to complete all tasks. (*Id.* at 65-67). The "Plan to Stay Caught Up" included several other items, none of which required an accommodation from LMG. (*Id.* at 67-73). There was also no reason why Lemieux could not have employed these strategies from the first day after she was promoted.

Lemieux acknowledged that the December counseling report contained goals and how to accomplish them, and clear deadlines. (Lemieux depo., at 260). Notwithstanding, Lemieux was unable to complete her tasks and fell behind on her client contact rate. As a result, LMG terminated Lemieux's employment in January, 2021. (*Id.*, at 272).

Prior to her termination, on August 28, 2020, human resources notified Lemieux that most of her accommodations were denied (*See* August 28, 2020 Notification attached hereto as **Exhibit 24**). The request for a timer was granted, however the others were denied on the grounds of undue hardship for the following reasons:

> Extra Support from the Supervisor:  Lemieux was provided training on inputting case notes into the software and she has received feedback verbally and in writing by using examples of notes that she created to help her understand what is expected. ***She failed to follow guidance that was provided on how to input notes more efficiently.***
>
> Change in Work Schedule:  LMG had previously moved her start time to 9:00[1] which extends her day one hour after office hours giving her quiet time to finish her tasks. Extending the workday conflicted with her request for more supervision and feedback because her supervisors would not be present after hours. ***Because Lemieux was unable to complete her work during work hours, she often requested to work after hours. However, despite LMG had a strict no overtime policy, Lemieux would still work overtime and not get the job done.*** Also, staying after hours presented a safety issue.[2] Accordingly, extending the start time would not address her inability to get work done in a timely manner.

---

[1]      This was the third request for an extended schedule. LMG previously granted a second request to have her workday begin at 9:00 a.m. because she was not "disciplined" enough to go to be at a reasonable hour. (Lemieux depo., at 73, 77).

[2]      Lemieux admitted this was a reasonable concern. (Lemieux depo., at 253-55).

Additional Feedback from the Supervisor:  Lemieux's supervisor was meeting with all case managers one-on-one at least once a month and cannot provide additional sessions because of time restrictions.[3]  ***However, the supervisor maintains an open door policy which Lemieux utilized almost daily for questions and support.***[4] LMG also had program restrictions that prevented addition additional duties to the supervisor, including feedback.

Creating a Daily Schedule:  ***This is unreasonable as it would place Lemieux's core responsibilities on the supervisor who is currently overseeing over 240 cases.*** This would also be an undue hardship because it would detract from the time the supervisor had to perform her job duties ***and would require LMG to pay two people to do one job.***  As an alternative, LMG recommended time management courses for Lemieux which she rejected.

(*See* Analysis of Denial of Accommodation **Exhibit 25**).  Lemieux acknowledged that adding extra work to her supervisor could be an undue hardship.  (Lemieux depo., at 249).

Lemieux brings a single cause of action under Title VII and the Kentucky Civil Rights Act claiming that LMG failed to accommodate her resulting in a demotion, and later the termination of her employment.  For the reasons set forth below, LMG did not fail to accommodate Lemieux's disability, and is entitled to summary judgment.

## **ARGUMENT**

## I.   **SUMMARY JUDGMENT STANDARD**.

When a court is evaluating a motion for summary judgment, the evidence is viewed in a light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*

---

[3]       Lemieux acknowledged that her supervisor met with the case managers at least once a month and that she had the opportunity to ask any questions, and seek any advice about report writing.  ***Indeed, her supervisor took random files and reviewed them with each case worker.***  (Lemieux depo., at 252).

[4]       Lemieux acknowledged this as well.  (Lemieux depo., at 253).

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Therefore, the central question at the summary judgment stage is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251. Despite this, "the nonmoving party cannot rest on its pleadings but must come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Therefore, when responding to any motion for summary judgment filed by Lemieux will be required to come forward with some evidence that establishes her claims, not her bare allegations.

Plaintiffs also have an obligation to demonstrate that there is "affirmative evidence" beyond their own subjective beliefs that discrimination occurred. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). As the Sixth Circuit has held: "[m]ere personal beliefs, conjecture and speculations" are insufficient to support a claim of discrimination. *See Chappell v. GTE Products Corp.*, 803 F.3d 261 (6th Cir. 1986); and *Wichowski v. General Elec. Co.*, 9 F.3d 111 (6th Cir. 1993)(affirming summary judgment in the employer's favor because the plaintiff's "subjective conclusions of sexual discrimination are insufficient to satisfy her burden of coming forward with sufficient proof to make out a prima facie claim of sex discrimination.").

A plaintiff must cite to evidence in the record to support the claim of discrimination in order to create a genuine issue of material fact for trial. *See Gunn v. Senior Services of Northern Kentucky*, 632 Fed.Appx. 839 (6th Cir. 2015); and *Vaughn v. Louisville Water Co.*, 302 Fed.Appx. 337, 346 (6th Cir. 2008)(summary judgment granted to the employer where the employee offered only her "unsupported speculations of an anti-female bias" at the company.). In other words, "[C]onclusory allegations and subjective beliefs... are wholly insufficient evidence to establish a claim of discrimination as a matter of law." *Mitchell*, 964 F.2d at 584-85.

Lemieux has not produced any evidence from which a jury could find that LMG failed to accommodate her disability.  She has admitted that at all times, she was not meeting her employer's expectations and that discipline was warranted.  She also acknowledged that she could not use a request for an accommodation to cure prior performance deficiencies.  In addition, there is no dispute that Lemieux's impairment did not prevent her from understanding her job expectations or that a failure to meet expectations could result in discipline.  Her request for "support" and "feedback" is not recognized under the ADA, and was not only unreasonable on its face but also created an  undue hardship on LMG and its employees.  As set forth in greater detail below, LMG is entitled to summary judgment on Lemieux's claims.

## II.   <u>LEMIEUX DID NOT REQUEST A REASONABLE ACCOMMODATION</u>.

To maintain a claim for disability discrimination based upon a failure to accommodate, a person must show that:

> (1) she is disabled; (2) she is otherwise qualified for the position; (3) the employer knew or had reason to know of her disability; (4) she requested an accommodation; and that (5) the employer failed to provide the necessary accommodation.

*See Kleiber v. Honda of Am. Mfg, Inc.*, 485 F.3d 862 (6th Cir. 2007).   A plaintiff is required to identify her "precise limitations" and potential reasonable accommodations.  Employers are not required to speculate as to the employee's need for an accommodation.  *Hagan v. Anderson County Fiscal Court*, 105 F.Supp.2d 612 (E.D.Ky. 2000).   Additionally, vague requests for accommodations are unreasonable as a matter of law.  *See McDonald v. UAW-GM Center for Human Resources*, 738 Fed.App'x 484 (6th Cir. 2018); *see also Cassidy v. Detroit Edison Co*., 138 F.3d 629 (6th Cir. 1998); and *Palmer v. Marathon Petroleum Company, LP*, 2018 Wage & Hour Cas.2d (BNA) 376, 886, 2018 WL 4956110 *11 (E.D.Ky.  Oct. 12, 2018)("requests for 'more help' and 'additional time' were vague and unreasonable eon their face…..").  An accommodation

will be reasonable if it addresses "a key obstacle preventing [the employee] from performing a necessary function of" the job. *Hagan*, 105 F.Supp.2d at 202 (citation omitted). In other words, the proposed accommodation must enable a person with a disability to perform the essential functions of the job. *See* 29 C.F.R. §1630.2(o)(1)(ii); and *McDonald* 437 Fed.App'x 848 (noting that the plaintiff must demonstrate that the accommodation was necessary in light of her limitations).

An accommodation asking for an employer to "work with" the plaintiff is not reasonable. This is illustrated in *Keys v. Joseph Beth Booksellers, Inc.*, 173 F.3d 429 (6th Cir. 1999). There, the Sixth Circuit found that a request that an employer "work with" the employee until he could get his condition under control was unreasonable. Plaintiff claimed to have trance-like, non-epileptic spells after which he would need to lie down for a period of time. However, the plaintiff failed to elaborate on how the employer could accommodate him and instead, asked only for his employer to "work with him" as an accommodation. The Court held that plaintiff's request to "work with him" was not a request for an accommodation requiring the employer to respond in any manner. As such, the plaintiff could not demonstrate that the employer failed to provide an accommodation and granted summary judgment in favor of the employer.

Similarly, in *Jakubowski v. Christ Hosp. Inc.*, 627 F.3d 195 (6th Cir. 2010), the plaintiff, a medical resident, suffered from Asperger's Syndrome and requested an accommodation of "knowledge and understanding" with respect to the essential function of communicating with colleagues and patients. Specifically, the plaintiff asked the hospital to educate the staff about his disorder and require understanding of his disability and what triggered his disability. Plaintiff, however, failed to demonstrate how the vague request of "knowledge and understanding" would

allow him to perform the essential functions of the job, and therefore, the hospital did not fail to accommodate him.

LMG did not fail to accommodate Lemieux.  To be clear, only one accommodation request is at issue in this case.  After consultation with Dr. Epstein, Lemieux **withdrew her first accommodation request** because she would rather work on her issues directly with her supervisors.  Moreover, Lemieux did not believe that the extra time recommended by Dr. Epstein would allow her to perform the essential function of submitting case reports on time.  Upon receiving this information, human resources properly closed the request.

**The second request was granted**.  Lemieux was allowed to use a tool to assist in staying on task in client meetings, created a daily routine and used a planner to assist with time management, was allowed to close her office door to stay focused, and her schedule was altered to come in a half-hour later.  Arguably, some of these were not true accommodations, but they were nevertheless granted.  As an example, Lemieux could have employed a calendar and created a daily routine on her own even if the request had been denied.  These accommodations remained in place when she submitted the third request.  As set forth herein, **this third request was properly denied**.

Before addressing the third request, it is also important to note that the request for "clear expectations communicated" and "clear deadlines" is not a request for an accommodation under the ADA.  Not only is this too vague to be an accommodation, Lemieux admitted that her impairment did not prevent her from understanding expectations of the job, the deadlines associated with the job, or that failure to meet expectations could result in disciplinary action.  Accordingly, the only reason she made this "request" was to address her supervisors "contradictory" guidance or instructions.  This was a communication issue, not a disability issue

19

that required an accommodation.  As such, any denial of this purported accommodation was not in violation of the ADA.

### A.     The Accommodation Requests were Too Vague.

LMG properly denied the remaining accommodations in Lemieux's third request to the extent that they were too vague.  Notably, Lemieux had performed the Senior Social Worker job for over ***sixteen years***.  She knew and understood how to create reports, and the importance of submitting them on time.  Indeed, for one year prior to her demotion, she was counseled on these very issues and given every opportunity to correct her deficiencies.  Her supervisors provided her substantial feedback and advice on how to prioritize her tasks, and her supervisor re-wrote one of her reports to demonstrate a way to succinctly summarize the information.   Despite a  year of guidance, advice, and counseling, Lemieux was unable to cure her deficiencies and was ultimately demoted.  Accordingly, when Lemieux applied for the promotion back to the Senior Social Worker position, she was well-aware of the consequences of not submitting the reports in a timely manner.[5]

Lemieux submitted her third accommodation request only after she faced disciplinary action for failing to perform the essential functions of the job.   She asked for an accommodation of extra "support" from a supervisor to be more "efficient," and "feedback" to aid her in identifying ways to "work smarter."   These statements are too vague to be implemented or reasonable, and further, there is no indication as to how such support and feedback was necessary to allow her to submit reports in a timely manner.  In addition, there is substantial evidence that her supervisors supported her and provided her with feedback throughout her tenure with LMG.  Lemieux had

---

[5]      This Court should also note that the accommodations granted under Lemieux's Second Accommodation Request were still in effect.  Dr. Epstein provided her with tools to assist her with her time management issues (such as the use of a timer, or alternative, the use of a calendar or planner, creating a daily routine or schedule to stay on task, closing her office door when needed to focus, and her start time remained later than every other employee).  She requested these accommodations to address the same limitations that existed in 2020 (time management, prioritizing and planning) and she remained unable to perform the essential functions of the Senior Social Worker position

received training and feedback on how to complete her case notes, both verbally and in writing. In 2018, her supervisor provided her with time management advice, and re-wrote one of her case notes (ask requested by Lemieux) to demonstrate how to better summarize the notes.  In 2018 and 2020, her supervisors met with her almost daily to answer any questions she had, and she had the opportunity at any time to discuss how to "work smarter."  Each of her supervisors demonstrated leniency with Lemieux by repeatedly extending deadlines for her to complete her work.  Indeed, the Performance Improvement Plans were designed to give her both extra time and the clear guidance necessary to successfully perform the essential functions of the job.  Furthermore, despite having a strict no overtime policy, Lemieux routinely worked overtime and still remained unable to complete her work on time.  None of Lemieux's supervisors' support or feedback resulted in her being able to perform the essential functions of her job, including the ability to submit reports on time.  Lemieux presented no evidence that the accommodation of "extra" support or feedback would have allowed her to perform the essential functions of the job.  Accordingly, the accommodation request properly denied as unreasonably vague.

Similarly, there was no evidence that the final request to push her work schedule back another half hour would have assisted her in completing the reports on a timely basis.  She would have still worked the same number of  hours, and demonstrated an inability to complete her work in that time frame.  Moreover, she acknowledged that there was a safety issues associated with having her in the building an hour after the close of business, justifying the denial of the change in work schedule.

### B.     The Accommodation Requests Created and Undue Hardship on LMG.

It is an essential function of every case manager's job to manage his or her case load, and prioritize tasks.  The request for extra "support" and "feedback" from the supervisor as well as the

request that her supervisor create a daily schedule for Lemieux would have resulted in a shifting of an essential function of the job and created an undue burden on her supervisor. Lemieux acknowledged that she had regular one-on-one meetings with her supervisor at least once a month at which time at least one case report was analyzed and discussed. In addition, Lemieux took full advantage of her supervisor's open door policy and frequently asked her questions. There was no reason why Lemieux could not have utilized these scheduled or impromptu meetings to inquire about her daily schedule or summarizing reports. Her supervisor supervised 8 other individuals and had other duties associated with the program and could not spend additional time do Lemieux's job, including, creating a daily schedule for Lemieux, or re-writing the reports she had been writing for sixteen years. LMG determined that the extra support and feedback beyond that which was already given would have unfairly shifted Lemieux's duties to her supervisor resulting in LMG paying two people do to Lemieux's job. Shifting duties is never a reasonable accommodation. *See Hoskins v. Oakland County Sheriff's Dep't* 227 F.3d 719, 729 (6th Cir. 2000)("the ADA does not require employers to accommodate individuals by shifting an essential job function onto others."); and *Bratten v. SSI Services, Inc.*, 185 F.3d 625, 632-33 (6th Cir. 1999)(employers are not required to assign the duties of the disabled employee to other employees as an accommodation).

LMG denial of the accommodation request was reasonable and not discriminatory. There is no dispute that her ability to complete reports on time was an essential function of the job, and at times, her failure to do so warranted discipline. Lemieux's accommodations were both vague and burdensome, justifying the denial of the third request. Accordingly, LMG is entitled to summary judgment as a matter of law.

Respectfully submitted,


*/s/ Cynthia L. Effinger*
CYNTHIA L. EFFINGER (KBA #87298)
McBRAYER PLLC
500 W. Jefferson Street, Suite 2400
Louisville, Kentucky 40202
Ph: (502) 327-5400
Fax: (502) 327-5444
Email: ceffinger@mcbrayerfirm.com
*Counsel for Defendant*

## **CERTIFICATE OF SERVICE**

I certify that on August 28, 2023, the foregoing was electronically filed with the Clerk of Court using the CM/ECF which will send notice of electronic filing to the registered counsel.


*/s/ Cynthia L. Effinger*
Cynthia L. Effinger
Counsel for Defendant


4892-1131-9163, v. 1