## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | | |
|---|---|---|
| **MARIANA LEMIEUX,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.: 3:22-CV-151-RGJ-CHL** |
| | ) | |
| **LOUISVILLE METRO** | ) | |
| **GOVERNMENT** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Mariana Lemieux, ("Lemieux"), by counsel, respectfully submits her Response in Opposition to Defendant, Louisville Metro Government ("LMG")'s Motion for Summary Judgment on Plaintiff's claims that LMG failed to accommodate her disability.

## I.  INTRODUCTION

Lemieux was hired by the Defendant in 2001 as a Senior Social Worker. Lemieux worked for many years in her role, working on several projects for LMG. While working at Cane Run Neighborhood Place, Lemieux was tasked with handling both case management duties and financial assistance duties. She began struggling with completing her tasks timely and based on questioning by her then-supervisor, Travis White ("White"), Lemieux sought evaluation by her healthcare provider and was diagnosed with Attention Deficit Hyperactivity Disorder-Inattentive Type in mid-2017. With a new diagnosis, Lemieux sought to navigate how to manage her diagnosis, treat her disabling condition, and manager her job duties. She worked informally with her supervisor to identify ways to help her overcome her difficulties and in November 2018, Lemieux applied for reasonable accommodations with LMG. At that time, Lemieux was uncertain about what accommodations could be available to her and about what accommodations would

necessarily help her manager her disability and she sought guidance from LMG employee, Janice Baldon-Gutter, as well as discussing her concerns with her healthcare provider. Baldon-Gutter was not helpful to Lemieux, and despite the time and effort Lemieux had invested into attempting to identify a reasonable accommodation, LMG closed her accommodation request. Days later, it demoted Lemieux to an Information & Referral Technician position.

In her demoted role, Lemieux again made a request for reasonable accommodations to LMG that this time were largely informally granted. Lemieux's supervisor also assisted Lemieux with creating an outline of her schedule which assisted Lemieux with staying on track and timely completing her work. Almost two years after her demotion, Lemieux applied for an open Senior Social Worker position with Housing and Support and after passing a required skills test, Lemieux began her new role reporting to Laura Winfrey. Because Lemieux thought she would be able to handle her case management role, initially Lemieux did not make another formal request for accommodations. When Lemieux found she was falling behind with completing her case files timely, in June 2020, Lemieux again reached out the HR to begin the accommodation process again. At this time, Lemieux had not been subject to any discipline for her job performance. While working with LMG and her healthcare provider to determine her accommodation requests, LMG met with Lemieux and informed her that her files were falling behind on July 28, 2020. Lemieux informed Winfrey and the Program Manager, Lisa Williams ("Williams") that she was in the process of requesting accommodations. When finalized, Lemieux requested four accommodations and her healthcare provider suggested an additional accommodation. On August 28, 2020, Lemieux was informed that other than a request for a timer, LMG had denied her requests for reasonable accommodation citing the undue burden on the Department. Between her submission of her requests and her notification of the denial, no one at LMG discussed any alternatives with

2

Lemieux or sought any clarification of Lemieux's request and the requests made by Lemieux were not only reasonable but required no significant burden on the Defendant.

Following the denial of her reasonable requests, Lemieux was placed on a discipline track and performance improvement plan. Lemieux continued working and attempting to timely complete her job duties but without accommodation, Lemieux fell behind. LMG then suspended Lemieux for 20-days and upon her return in November 2020 incorrectly told Lemieux she would have a "clean slate." Lemieux, while on suspension, purchased a time management intensive course and began working with a job coach *on her own*. She was working on implementing the new tools and strategies she learned but despite this, LMG again placed Lemieux on a performance improvement plan in December 2020. Lemieux focused on improving her client contact rate and while it did improve in her last month, she still struggled to meet the minimum. Because of this, Lemieux sought an extension of her performance improvement plan, but instead of granting this, LMG terminated Lemieux's employment. Other Senior Social Workers were also not meeting the required minimum monthly contact rate but received no discipline.

Lemieux filed her Complaint against LMG alleging that she was discriminated against on the basis of her disability when she was demoted in 2018 and terminated in January 2021. Further, Lemieux alleges that LMG failed to reasonably accommodate her disability.  LMG has moved for summary judgment arguing only that LMG did not fail to accommodate Lemieux. Below, Lemieux offers evidence that her accommodation request in summer of 2020 for her disability was reasonable and that it would have allowed her to perform the essential functions of her position. Further, Lemieux argues that LMG has not put forth sufficient evidence to show that the request accommodations would cause an undue hardship on the department. That evidence coupled with other relevant pieces of evidence precludes the grant of summary judgment.

## II.  STATEMENT OF MATERIAL FACTS IN DISPUTE

Lemieux disputes the following material facts as asserted by LMG in its Motion for Summary Judgment.  For ease of reference, Lemieux repeats the facts asserted by LMG in italics with her response immediately following.

### A.      Plaintiff's Response to Defendant's Cited Facts

*Dr. Lee Epstein provided Lemieux with a report and recommendations to address her difficulties in "keeping up with the paperwork": ...To use visual prompts such as colorful notes and placement of items to remind her to do certain things. (Lemieux testified she did not think that she had memory issues, so this was not a strategy she would use, Lemieux depo., at 95). Def's Brief, page 5.*

DISPUTED/CLARIFIED:  Lemieux did testify that she did not feel she struggled with memory problems, but also testified that she did use visual reminders including Post-Its and desk calendars.

**[Plaintiff's Exhibit 1 – Deposition of Mariana Lemieux (hereinafter "Lemieux Dep.")** at 95]

Further, Lemieux testified that she had purchased a visual timer which was a special timer.

[Lemieux Dep. at 233-234.]


*Dr. Lee Epstein provided Lemieux with a report and recommendations to address her difficulties in "keeping up with the paperwork": ... To develop daily rituals and routines. (Lemieux testified that she chose not to create any daily routines, Lemieux depo., at 97-101).* [Def's Brief, page 5.]

DISPUTED/CLARIFIED: Lemieux testified that she *did not recall* if she did anything differently in terms of creating daily rituals or routines. [Lemieux Dep. at 101]



*Lemieux was incredibly candid when explaining that the accommodation of "clear expectations communicated" was completely unrelated to her ADHD diagnosis because she knew she was expected to complete case reports on time. (Lemieux depo., at 170). In other words, she did not need an accommodation to understand that her tasks had deadlines, and that failure to*

*meet those deadlines could result in discipline. Instead, she clarified that her issue was her supervisor's contrary instructions.* [Def's Brief, page 7]
DISPUTED/CLARIFIED:  Lemieux testified:

> Q.    Okay, okay. Then you say, "The biggest thing is that management be clear in terms of expectations." That's what we just talked about that was on your list. But you knew what your expectations were of the job. This is a job you had been doing for years, you knew the expectations of completing notes, completing notes on time, contacting and following up with the participants, right? You knew those expectations.
>
> A.    Yes. I mean, I had the policy, which, you know, didn't, like I said, define everything.

[Lemieux Dep. at 169-170]. Lemieux had previously testified that the policies which guided her work were not clear. [Lemieux Dep. at 32-33] Further, Lemieux is not a physician or medical provider and could not determine whether an accommodation suggestion was unrelated to her diagnosis. Further, Lemieux did testify that her supervisor's contrary instructions caused her issues which is why she sought clear written instructions because "when there's clear communication – when the expectations are clear then it makes your work easier because you know exactly what." [Lemieux Dep. at 158]

*Similarly, the accommodation for "clear deadlines for any tasks which would bring a consequence of disciplinary action" was completely unrelated to her ADHD diagnosis. Lemieux acknowledged that she did not need an accommodation to know that failing to meet deadlines could result in discipline… Indeed, Lemieux acknowledge that she had no impairment that prevented her from understanding when there were deadlines, and was only frustrated with her supervisor's communication style.* [Def's Brief, page 8]
DISPUTED: Again, Lemieux is not a healthcare provider. And while Lemieux testified that she did not need an accommodation to *know* that failure to meet deadlines could result in discipline, she certainly needed an accommodation to help her meet the deadlines. [Lemieux Dep. at 24;

**Plaintiff's Exhibit B – Declaration of Mariana Lemieux (hereinafter "**Lemieux Decl.") ¶ 16]

Further, Lemieux testified that there was a difference between the verbal communication she was receiving from her supervisor and the written communications. [Lemieux Dep. at 175]

*In other words, Lemieux rejected the one accommodation Dr. Epstein suggested because it would not assist her in performing the essential functions of her job. (Lemieux depo., at 169). She told human resources that she didn't "want to ask for more time if cases have to be turned in in 11 days. Caseload numbers, I don't feel like I should have a lower caseload.* ***I am not sure what accommodations I need.*** *" (See* **Exhibit 10** *(emphasis added); see also Lemieux depo. at 170). [Def's Brief, pg 9]*

CLARIFIED:  Lemieux was, at the time of her accommodation request, still trying to understand her new diagnosis and how to work with the diagnosis. [Lemieux Decl. ¶ 3] Lemieux applied for accommodations and sought assistance from LMG in discussing possible accommodations but did not receive assistance from Janice Baldon-Gutter, LMG's accommodation specialist. At this time, Lemieux was trying to figure out what to ask for and she was having difficulty articulating her asks because she did not have the information and felt she did not get good guidance. [Lemieux Dep. at 171]

*Lemieux again admitted that this was not an accommodation for her disability, but instead a request for better communication from her supervisor. (Lemieux depo, at 198-99). [Def's Brief, pg 10]*

DISPUTED/CLARIFIED:  Lemieux's request was for clear communication from her supervisor in writing and reinforced verbally. At the base, this was a communication issue, but Lemieux's request for clarity in this area was an accommodation request for her disability. [Lemieux Dep. at 199, Lemieux Decl. ¶ 14]

*Lemieux admitted that most of these accommodations were tool strategies that she could implement herself without any accommodation from LMG. For example, she did not need anything from LMG to create a daily routine (Lemieux depo, at 214-15).*

CLARIFIED:  Lemieux clarified that her supervisor at the time, Nanette Dix, did create a written daily routine for her. [Lemieux Dep. at 215] Lemieux sought support from Winfrey to create a general schedule as Dix had done. [Lemieux Decl. ¶ 15]


*When she faced discipline, she submitted her third request for accommodations. [Def Brief, pg 11]*
DISPUTED/CLARIFIED:  At the time she submitted her third request for accommodations in June 2020, Lemieux was not subject to any discipline. [Lemieux Decl. ¶9] Lemieux found herself behind and then asked for accommodations. [Lemieux Dep. at 226]


*In this third request, Lemieux sought vague accommodations: extra "support" from her supervisor to become before efficient in writing case notes, including having her supervisor re-write her notes to better understand what should be included; a visual timer or cell phone application to use while meeting with clients; a change in her start time from 9:00 to 9:30; and "feedback" from her supervisor to aid her in identifying ways to work smarter. [Def's Brief, pg 12]*
DISPUTED: Lemieux disputes that these accommodations were vague as outlined below in Section III.B.


*In this [August 2020] disciplinary report, her supervisor noted that she had regular one-on-one meetings with Lemieux but the performance issues persisted. Lemieux was given clear guidance to improve her performance. (Id., see also Lemieux depo., at 242).*
DIPSUTED:  By August 2020, Lemieux had had 1:1 supervision meetings with Winfrey, her supervisor, on five occasions only: 3/26/20, 5/19/20, 5/19/20, 7/7/20, 7/28/20. [Lemieux Decl. ¶11] Further, the disciplinary report Lemieux received in August included Required Action that laid out some tasks for Lemieux to complete including completing tasks "per the Case Manager SOP Checklist." The SOP Checklist at issue had been undergoing changes during this time frame and had actually been addressed by a committee of Senior Social Workers because it lacked detail.

**[Plaintiff's Exhibit C - Deposition of Lisa Williams, (hereinafter "Williams Dep. ") at 37-38]**

*Lemieux blamed part of her inability to meet expectations on her supervisor not providing clear instructions to any of the case workers. (Id. At 244). This has nothing to do with her impairment. (Id.). This Performance Improvement Plan also set forth clear expectations. (Id. at 244-45; 246). While on the Performance Improvement Plan, Lemieux's supervisor met with her at least weekly to assist her in successfully completing the Plans. (Id. at 255-56). During those sessions, Lemieux complained that part of her difficulties resulted from the program manager and her supervisor providing conflicting instructions, which was not related to her impairment. (Id. at 256-57).*

DISPUTED:   Winfrey's poor communication skills did affect all the Case Managers, but as

Lemieux needed clearly communicated expectations and deadlines as per her Second

Accommodation Request, Winfrey's changing directives and lack of clear communication caused

issues for Lemieux because of her impairment. [Lemieux Decl. ¶ 20] Similarly, the conflicting

information from Winfrey and Williams affected how Lemieux did her job and caused issues for

Lemieux because of her impairment. [Lemieux Dep. at 256-257, Lemieux Decl. ¶ 20]  Further,

Winfrey did not meet weekly with Lemieux. [Lemieux Decl. ¶11 and corresponding Ex. 1]


*She was given clear expectations and goals to address the issues. (Lemieux depo., at 259).*

DISPUTED:   Lemieux testified that "things changed all the time with Laura [Winfrey], the way

that she had me doing things could be altered. I mean, it was altered and so this nice neat little way

that looks like we're supposed to do things (referring to the Counseling Report from December

2020) in reality did not happen that way." [Lemieux Dep. at 260]


*While she was out on suspension, her supervisor completed some of Lemieux's work to help her catch up, but several overdue cases remained upon Lemieux's return to work. (Lemieux depo., at 271-72).*

CLARIFIED:   Lemieux testified that while she was out on suspension, she was told that Winfrey

had caught up all her work and that she should have been able to come back and pick right up.

[Lemieux Dep. at 271-72]. Further, Winfrey told Lemieux she had a "clean slate" when she

returned from her suspension. [Lemieux Dep. at 60]   However, this was note true and Lemieux

was not caught up at her return. [Lemieux Dep. at 63-64]

*Notwithstanding, Lemieux was unable to complete her tasks and fell behind on her client contact rate. As a result, LMG terminated Lemieux's employment in January 2021 (Id. at 272). [Def's Brief, page 14]*
DISPUTED:  Other Senior Social Workers also fell behind on their client contact rate but were

not disciplined. [Williams Dep. at 88-89]

### B.    Plaintiff's Statement of Additional Material Facts

1.    Lemieux was hired as a Senior Social Worker by LMG on December 17, 2001 and

she worked in this role until 2018. During those years, Lemieux worked on different programs

because grant funding ended or programs were phased out. In 2018, when she was demoted,

Lemieux was working at Cane Run Neighborhood Place. In this role, her duties included handling

financial assistance applications and short-term case management. [Lemieux Dep. 10-13] In the

relevant time period, Lemieux reported to Travis White and the Program Manager was Cassandra

Miller [Lemieux Dep. at 80]

2.    In February 2017, Lemieux received a Documentation of Pre-Disciplinary or

Disciplinary Action and three-day suspension for past due cases. This came following previous

verbal and written discipline for similar issues in the year prior. During her counseling, LMG

required Lemieux to attend a Time Management Training session, and she complied. However,

the training provided was not as intensive as Lemieux needed. [Lemieux Decl. ¶ 2] At this time,

Lemieux had not yet been diagnosed with ADHD. [Lemieux Dep. at 80]

3.    Upon questioning by her supervisor if she had been tested for ADHD, Lemieux was

seen by Dr. Lee Epstein who evaluated and diagnosed Lemieux in July 2017. [See Defendant's

Exhibit 4[1]; Lemieux Dep. at 91-92] In his evaluation, Dr. Epstein noted that Lemieux showed "a very significant Attention Deficit Hyperactivity Disorder inattentive type." He noted that this causes "a delay in executive functioning, that is a problem with time management, organization, and follow through." [See Defendant's Exhibit 4, Psychological Evaluation 7/25/2017] Further, Dr. Epstein made some generic recommendations that were not specific to Lemieux's diagnosis for coping with the condition. [Lemieux Dep. at 92; Lemieux Decl. ¶3] During this time, Lemieux was working informally with her supervisor given her recent diagnosis and was seeking a fresh start. [Lemieux Dep. at 97] Lemieux asked that her supervisor work with her and recognize that her diagnosis and its implications were something new to her. [Lemieux Dep. at 106-107]

4.    Lemieux attempted initially to work informally with her supervisor, but in November 2017, Lemieux applied for reasonable accommodations with LMG. [Lemieux Decl. ¶4] Lemieux spoke with Janice Baldon-Gutter in on multiple occasions between November 2017 and May 2018. During an initial conversation, Lemieux was unsure what specific accommodations she should request and sought guidance from Baldon-Gutter. Baldon-Gutter told Lemieux only to Google reasonable accommodations or to ask her doctor. [Lemieux Decl. ¶4; Lemieux Dep. at 186] After Dr. Epstein had submitted his initial documentation, Lemieux spoke with Baldon-Gutter again seeking assistance. Lemieux again had difficulty trying to determine the accommodation she needed and Baldon-Gutter offered no assistance other than to send a form back to Dr. Epstein requesting clarity. Lemieux did not receive good guidance [Lemieux Decl. ¶4; Lemieux Dep. at 171] Lemieux wanted to speak with Dr. Epstein himself and based on their discussion, Lemieux decided she would utilize the extra focused support from her supervisor as an accommodation. She did not wish to close her ADA reasonable accommodation request. [Lemieux

---

[1] Plaintiff refers to Defendant's Exhibit Numbers where appropriate.

Decl. ¶ 4] On or about February 5, 2018, Lemieux's accommodation request was closed by Baldon-Gutter. [Lemieux Decl. ¶4, Defendant's Exhibit 12]

5.       As of December 21, 2017, White informed her that it appeared she was caught up with the exception of two cases. White further gave Lemieux the freedom to implement any changes she saw necessary and provided her with a few directions. [**Plaintiff's Exhibit D – Email from White to Lemieux 12.21.17**] Despite this, on February 6, 2018, Lemieux was recommended for demotion  to an Information and Referral Technician position. [Lemieux Decl. ¶5, see Defendant's Exhibit 13]

6.       While working as an Information and Referral Technician, Lemieux again requested reasonable accommodations in February 2018. [Lemieux Dep. at 218] During her discussion with Baldon-Gutter, Baldon-Gutter for the first time directed Lemieux to the JAN Network to search for examples of reasonable accommodations specific to Lemieux's diagnosis. [Lemieux Dep. at 189; Lemieux Decl. ¶ 6]

7.       Informally, Lemieux's supervisor, Nanette Dix, helped create an outline of a daily schedule for Lemieux to follow. [Lemieux Dep. at 259; Lemieux Decl. ¶7]

8.       Nearly two years later, Lemieux applied for a Senior Social Worker position with the Housing and Support program and because she was able to pass a skills test, she was selected for the position. [Lemieux Dep. at 222-23] Lemieux reported to Laura Winfrey. Winfrey frequently gave the Senior Social Workers working under her conflicting information and was a poor communicator. [Lemieux Dep. at 30-31; 244] In fact, Winfrey received coachings from her supervisor, Lisa Williams, for her communication style. [Williams Dep. at 93-94]

9.       Initially, when Lemieux began working as a Senior Social Worker Housing and Support in early 2020, she did not submit an additional request for accommodations for her

disability because this role involved only case management while her previous Senior Social Worker role involved both case management and financial assistance.  Because of this, Lemieux attempted to work out any issues with time management prior to requesting accommodations. [Lemieux Dep. at 224-225; Lemieux Decl. ¶9] As Lemieux continued in her role, she recognized that she was falling behind on her job duties and on or about June 19, 2020, she reached out to request accommodations. [Lemieux Dep. at 226] LMG, through Steven Puckett in Human Resources, communicated with Lemieux about her limitations and possible accommodations. [Lemieux Dep. at 227] At this time, Lemieux had not been issued any formal discipline. [Lemieux Decl. ¶ 9]

10.     After back and forth with her healthcare provider and Puckett between June and July, on August 13, 2020 Lemieux submitted a request for:

**3.  What accommodation(s) will assist you in performing the job function(s)?**

- Support from supervisor in becoming more efficient with writing case notes – I need to learn how to summarize information and write w/ less detail.  Specifically, I would like my supervisor to take a few case notes I have written and re-write them so that through comparing & contrasting the two I can develop a strong sense of what details should be included; and, how to write in a more clear & concise way without being too vague.
- I have a time-timer (visual) clock and/or the same in cell phone app version that I would like to be able to use while meeting/conducting business with clients.
- Change my work schedule from 9-6 to 9:30-6:30.
- Feedback from supervisor as appropriate that could aid me in identifying ways to work smarter in how I am doing my job.

[Defendant's Exhibit 18] Additionally, Dr. Epstein suggested two reasonable accommodations to allow Lemieux to perform her position: allowing Mariana to work from 9:30am to 6:30pm and supporting Mariana in making a daily schedule to complete tasks on time. [Defendant's Exhibit 25, Memorandum Response 8.24.20]

11.     Meanwhile, on July 28, 2020, Lemieux had a 1:1 supervision meeting with Winfrey. Williams was also in attendance. During that meeting, the parties discussed Lemieux taking a time management class. [Lemieux Decl. ¶10] Lemieux explained that she had previously

taken a time management training offered by LMG and needed a more intensive course. Williams suggested and it was agreed that Winfrey would assist Lemieux with finding a more appropriate course, but Lemieux was never offered any such course. [Lemieux Decl. ¶ 10]

12.     On August 24, 2020, Williams submitted a Memorandum regarding Lemieux's requested accommodations. Other than agreeing to provide Lemieux with a desktop stopwatch – something Lemieux did not need – Williams stated that LMG could not accommodate beyond what was currently being provided to Lemieux. [Defendant's Exhibit 25-Memorandum Response 8.24.20; Lemieux Dep. at 247-249]

13.     Specifically, LMG declined to take a few of Lemieux's case notes and re-write them so that Lemieux could compare to understand what details should be included. Williams never re-wrote one of Lemieux's notes and neither did Winfrey. [Williams Dep. at 40; Lemieux Decl. ¶ 12]

14.     LMG also declined to change Lemieux's work schedule from 9am-6p to 9:30am-6:30pm. [Defendant's Exhibit 25, Memorandum Response 8.24.20] Williams testified that it was possible for Lemieux to work 9:30am to 6pm and take a shorter, 30-minute lunch. [Williams Dep. at 44] This option was never offered to Lemieux [Lemieux Decl. ¶ 13]

15.     LMG also would not accommodate Lemieux's request for feedback from her supervisor on ways to work smarter in her job. Williams noted that it could not provide further support because the department is HUD regulated in its operational practices and accountable to the Continuum of Care for Case Management Standards. [Defendant's Exhibit 25, Memorandum Response 8.24.20] Williams further stated that the internal Case Management Standard Operating Procedures determine case management practices and any inconsistencies puts the Department at risk of receiving a non-compliance report from HUD and/or the Continuum of Care and the

possibility of losing a grant or having to pay a fine. Williams testified that the department did not receive a non-compliance report or lose any grant because of Lemieux's case management. [Williams Dep. at 48-49]

16.    LMG also declined to support Lemieux in making a daily schedule to complete tasks on time stating that "to do any more…is to basically have the supervisor taker over most of Mariana's core responsibilities." [Defendant's Exhibit 25, Memorandum Response 8.24.20] Williams further stated that to require a daily tasks list for one case manager would basically mean the supervisor was taking on the case manager's role, that LMG would be paying two people to perform one job, and that the supervisor's supervisory tasks would suffer. Williams also stated that LMG had recommended that Lemieux attend a time management training but that this was rejected by Lemieux, but Lemieux did not reject the training – she simply sought something more intensive than what was initially offered. [Lemieux Decl. ¶ 10]

17.    Lemieux, in her ADA request, was not asking for her supervisor to create a task list each day; instead, she was requesting that her supervisor assist her in creating a general schedule like her previous supervisor, Nanette Dix, had done. [Lemieux Dep. at 215; Lemieux Decl. ¶ 15] Williams never discussed the accommodation request with Lemieux or sought any clarifying information from her. [Williams Dep. at 43] In fact, in between Lemieux submitted her final, formal request on or about August 13, 2020 and her receiving notice that LMG denied her accommodation requests on August 28, 2020, no one with the Department discussed any of her requests with Lemieux [Lemieux Decl. ¶ 15]

18.    On August 28, 2020, LMG denied Lemieux's accommodation request stating that the decision not to provide the accommodations was based on undue hardship placed on the department. Lemieux called DeAndrea Baltimore after receiving notice and expressed her

frustration and concerns and asked if there was any recourse. [Lemieux Decl. ¶ 17] Baltimore informed Lemieux there was nothing else she could do but that Lemieux could speak with her supervisors. Lemieux understood that her management were the ones who had denied her request and offered no alternatives so she thought speaking with them further would not be useful. [Lemieux Decl. ¶ 17]

19.     On September 4, 2020, Lemieux received a warning for not meeting expectations related to her case files. On September 21, 2020, Lemieux received a formal reprimand and was placed on performance improvement plans related to Job Knowledge and Quality. Despite being told this was the plan, Winfrey did not meet weekly with Lemieux to review her progress as was proposed by the plan. During September, Lemieux and Winfrey met one-on-one on September 11, 2020. [Lemieux Decl. ¶ 18 and Ex. 1]

20.     Winfrey had an open-door policy that Lemieux did utilize weekly, but this time was subject to interruptions. When Winfrey and a Case Manager met one-to-one, there would be not interruptions – the door was closed during this time. [Williams Dep. at 46-47]

21.     Despite having only been placed on a performance improvement plan on September 21, 2020, on October 2, 2020, LMG suspended Lemieux for 20-days. [**Plaintiff's Exhibit E - October 2, 2020 Suspension**] Lemieux returned on November 5, 2020 and was told by Williams that she had a "clean slate" and that Winfrey had caught up Lemieux's work with the exception of some case notes that could not be deciphered from Lemieux's handwriting. After being informed by Williams of the 20-day suspension, Lemieux requested both verbally and in email to be allowed to push back her suspension to be able to catch up her case files. [Lemieux Dep. at 271; Lemieux Decl. ¶19] This did not occur, and upon return, Lemieux was already behind due to clients needing recertifications, Service Plans, and Scale Assessments which required significant time to complete.

[Lemieux Decl. ¶19] Further, upon her return, Winfrey provided to Lemieux a spreadsheet of what had been completed for each case file and what remained to be done; Winfrey told Lemieux she could use this going forward, but two weeks later, Winfrey instructed Lemieux to stop using the chart and to return the spreadsheet to her [Lemieux Decl. ¶19] Further, management gave inconsistent directives regarding what Lemieux was to complete each month with clients. Originally, Williams, in Winfrey's presence, instructed Lemieux to only complete current paperwork (the Home Visit Checklist and a monthly Budget form) and then approximately two weeks later, Winfrey instructed Lemieux to also complete "scale assessments, file updates and electronic documentation." Because of this, Lemieux felt she was set up to fail [Lemieux Decl. ¶ 19 and Ex 3, Emails Dated 11/18-24/20]

22.     The accommodations Lemieux sought would have helped her resolve her issues. She would have learned how to write case notes efficiently so as to not spend excessive time on notes, as her disability caused her to write too lengthy and too detailed of notes and Lemieux could not determine what could be eliminated. [Lemieux Dep. at 263-64; Lemieux Decl. ¶ 21]

23.     While on suspension, Lemieux began working with a job coach and purchased and completed an intensive time management course. [Lemieux Decl. ¶ 22]

24.     On December 11, 2020, Lemieux was issued a counseling and placed on another performance improvement plan that was to be active through January 8, 2021. [See Defendant's Exhibit 21] The plan included check-in dates for December 18, December 28, January 4, and January 8, 2021. Lemieux met with Winfrey one-to-one regarding her progress only on December 18. [Lemieux Decl. ¶23 and corresponding Ex. 1]

25.     While on the December performance improvement plan, Lemieux was in the process of implementing new tools and strategies she learned from the job coach and time

management course. Lemieux's monthly client contact rate increased despite missing the goal. [Lemieux Decl. ¶24] To this end, on January 22, 2021, Lemieux requested an extension of her performance improvement plan through March 11, 2021 to allow her to continue to implement the tools and strategies. [Lemieux Decl. ¶24, Ex. 3] Instead, on January 27, 2021, LMG terminated Lemieux's employment for not timely completing case files and not meeting the required monthly client contact rate of 80%.

26.     Other Senior Social Workers on Lemieux's team did not timely complete case files and/or meet the required monthly minimum 80% contact rate but did not receive discipline. [Williams Dep. at 90]

27.     The Case Management Standard Operating Procedure ("CM SOP") for Housing and Support was in a state of flux during Lemieux's employment. Because of this, four Senior Social Workers formed a committee around November 2019 to make the policies and procedures more detailed and make the procedure clear. [Williams Dep. at 37-38] The committee finalized its revisions in July 2020 [Williams Dep. at 36] However, the CM SOPs were again revised in November 2020 and Lemieux did not receive training on the new SOPs until January 2021. [Lemieux Decl. ¶25; **Plaintiff's Exhibit F - 2020 CM SOP Revisions**]

### III.  ARGUMENT

#### A.     Standard on Summary Judgment

Defendant has moved for summary judgment only on Lemieux's claim of failure to accommodate[23]. Rule 56(c) of the Federal Rules of Civil Procedure states that "summary judgment

---

[2] In light of the Sixth Circuit's standard on summary judgment, discovery has generated insufficient evidence to prevail on Lemieux's claim that LMG failed to accommodate her in 2018 and thus abandons her claim related to this accommodation request only.

[3] Defendant did *not* move for summary judgment on Lemieux's disparate treatment claims under the KCRA and ADA. See Dkt. No. 26 and corresponding memorandum. As such, and as outlined further in Section C, LMG is not entitled to summary judgment on either claim.

shall only be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. (56)(c).  In reviewing a motion for summary judgment, the court must view the evidence in a light most favorable to the non-movant, here Houf, as well as draw all reasonable inferences in Lemieux's favor. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).  The court, however, must not judge the evidence or make findings of fact. *60 Ivy Street Corporation v. Alexander*, 822 F.2d 1432, 1436 (6th Cir. 1987).  Evaluating credibility, weighing evidence, and drawing factual inferences are all functions for a jury at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Here, when the evidence, all facts and all inferences are resolved in Lemieux's favor, genuine issues of material fact exist that must be resolved by a jury.  As such, Defendant's Motion for Summary Judgment should be denied.

### B. Lemieux Can Establish Her Failure to Accommodate Claim for Her 2020 Accommodation Request

#### 1. *Applicable Standard under the ADA & KCRA.*

An employer discriminates against an otherwise qualified individual on the basis of a disability when it does not make "reasonable accommodations to the known physical or mental limitations" of the individual unless the employer can demonstrate that the accommodation would "impose an undue hardship on the operation" of its business. 42 U.S.C. § 12112(b)(5)(A). A failure to accommodate claim "unavoidably 'involve[s] direct evidence (the failure to accommodate) of discrimination' because the employer necessarily relied on the worker's disability in making decisions." *Cash v. Siegel–Robert, Inc.,* 548 Fed.Appx. 330, 334, 2013 WL 6231791, at *4 (6th Cir. Dec. 3, 2013) (quoting *Kleiber v. Honda of Am. Mfg., Inc.,* 485 F.3d 862, 868–69 (6th Cir.2007)). Accordingly, the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) does not apply.

18

In direct evidence cases, the plaintiff bears the burden of showing that she "(1) has a disability, and (2) is otherwise qualified for the position, either (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation." *Kempter v. Mich. Bell Tel. Co.,* 534 Fed.Appx. 487, 490 (6th Cir.2013) (citation and internal quotation marks omitted). Plaintiff must establish that she "requested and was denied" a reasonable accommodation. *Lockard v. Gen. Motors Corp.,* 52 Fed.Appx. 782, 786 (6th Cir.2002). Plaintiff's burden includes showing both that plaintiff proposed an accommodation and that the proposed accommodation was reasonable. *Jakubowski v. Christ Hosp., Inc.,* 627 F.3d 195, 202 (6th Cir.2010) (citation omitted). The employer has no duty to provide a reasonable accommodation until plaintiff requests same. *Breitfelder v. Leis,* 151 Fed.Appx. 379, 386 (6th Cir.2005) (no failure to accommodate when plaintiff remained silent).

To properly request a reasonable accommodation, plaintiff need not use any "magic words[,]" like accommodation, disability, or ADA. *Leeds v. Potter,* 249 Fed.Appx. 442, 449–50 (6th Cir.2007) (citing *Smith v. Henderson,* 376 F.3d 529, 535 (6th Cir.2004)). Plaintiff must, however, tie the request, in context, to his existing medical restrictions. *Id.* Upon request for reasonable accommodation, plaintiff triggers "an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(*o*)(3).In the Sixth Circuit, the informal, interactive process is mandatory. *Lafata v. Church of Christ Home for Aged,* 325 Fed.Appx. 416, 422 (6th Cir.2009) (quoting *Nance v. Goodyear Tire & Rubber Co.,* 527 F.3d 539, 556 (6th Cir.2008)). Accordingly, "[p]arties should not obstruct the process, or refuse to participate" in good faith, *Jakubowski,* 627 F.3d at 202, and ought to participate directly with each other. *Kleiber,* 485 F.3d at 871.

As Defendant LMG *does not dispute* that Lemieux has a disability, Lemieux will address the following: that she was qualified for her position with a reasonable accommodation and Defendant denied her a reasonable accommodation that did not rise to level of an undue hardship on the Defendant.

### 2. *Lemieux Made a Request for Reasonable Accommodations that Would Allow Her to Perform Her Position*

Whether an accommodation is reasonable is a "highly fact-specific" inquiry often best left for a jury. *Schroeder v. AT&T Mobility Servs., LLC*, 568 F. Supp. 3d 889, 893–94 (M.D. Tenn. 2021); *Anderson v. City of Blue Ash*, 798 F.3d 338, 356 (6th Cir. 2015); *see also Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998) ("The reasonableness of an accommodation is a fact issue."); *E.E.O.C. v. J. Disposition Corp.*, No. 1:10-CV-886, 2011 WL 5118735, at *4 (W.D. Mich. Oct. 27, 2011) ("Whether the accommodation proposed by [plaintiff] was objectively reasonable is a question of fact for a jury.").

"In determining whether an accommodation is reasonable, the employer must consider (1) the particular job involved, its purpose, and its essential functions; (2) the employee's limitations and how those limitations can be overcome; (3) the effectiveness an accommodation would have in enabling the individual to perform the job; and (4) the preference of the employee." *Kovac v. Superior Dairy, Inc.*, 998 F. Supp. 2d 609, 620 (N.D. Ohio 2014)(*citing Keever v. City of Middletown*, 145 F.3d 809, 812 (6th Cir.1998) (citing 29 C.F.R. § 1630.9(a), appendix)).

In 2020, in her third ADA request, Lemieux made a request for support from her supervisor to become more efficient in writing case notes, including: having her supervisor re-write a few notes to better understand what should be included; a visual timer or cell phone application to use while meeting with clients; a change in her schedule from 9:00am to 6pm to 9:30am to 6:30pm; feedback from her supervisor to aid her in identifying ways to work smarter. Further, Lemieux's

20

physician suggested that LMG support her in making a daily schedule to complete tasks on time. [Defendant's Exhibit 25, Memorandum Response 8.24.20] With these accommodations, there is question of fact as to whether Lemieux would have been able to meet the deadlines imposed on her as a Senior Social Worker such that she would not have been subject to the continuing progressive discipline that ultimately resulted in her termination. LMG argues that Lemieux did not identify how providing the purported accommodations would allow Lemieux to fulfill the essential functions of her position, arguing that LMG offered Lemieux support along the way and provided her with clear expectations. To the contrary, Lemieux testified that over the time she was supervised by Winfrey, she was *not* provided clear guidance; instead, she received conflicting guidance from Winfrey and Williams as it related to the policies and procedures that guided how she completed her job duties. [Lemieux Decl. ¶19-20] LMG further asserts that a request for "clear expectations communicated" and "clear deadlines" is not a request for accommodation under the ADA, arguing instead that the contradictory guidance given by Lemieux's supervisors was a communication issue, not a disability issue. But this misses the point of Lemieux's disability itself. If a supervisor is providing contradictory direction or contradictory expectations, it is going to cause more issues for an individual who struggles with executive functioning (as Dr. Epstein noted in July 2017) than an individual who has no such struggles. Further, the guidelines which controlled how Lemieux performed her job – namely, the Standard Operating Procedures – were in a state of flux in 2020, undergoing revisions in July and November 2020.

Ultimately, because of these struggles related to her disability, Lemieux sought accommodations. The burden for Plaintiff to identify a reasonable accommodation is not difficult to fulfill. "The employee's initial burden of articulating a reasonable accommodation need not be onerous. For the purposes of a *prima facie* showing, the plaintiff must merely suggest the existence

of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Hagan v. Anderson Cnty. Fiscal Ct.*, 105 F. Supp. 2d 612, 617 (E.D. Ky. 2000)(*citing Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 781 (6th Cir.1998). Lemieux's suggested accommodations certainly meet this threshold.

LMG argues, however, that the requests made in her third accommodation request were all properly denied as the requests were too vague.[4] But that too is a question of fact for the jury to decide. Lemieux requested "support from supervisor in becoming more efficient with writing case notes." LMG reads this request as a generic request for "support," but fails to acknowledge that Lemieux *specifically* requested that her supervisor re-write *a few* of her case notes to help her understand what should be included. This request is not vague and neither Winfrey nor Williams ever did this for Lemieux. [Lemieux Decl. ¶12; Williams Dep. at 40] Lemieux understood the requirements of her position but because of her disability, she struggled to translate the requirements into completed work. For this reason, she sought a model for what she should and should not include, as she struggled to know what details to eliminate. [Lemieux Decl. ¶21] This resulted in Lemieux taking extra time to write overly detailed notes and prohibited her from being able to timely submit the reports. Lemieux acknowledges that her supervisor, Winfrey, provided her with 1:1 meeting time occasionally and that Winfrey had an open-door policy, but what she needed – and what she requested – was an example to use to help her streamline her note writing which in turn would have allowed her to complete her reports. [Lemieux Decl. ¶21] This request

---

[4] Lemieux recognizes that her request for "feedback from supervisor as appropriate that could aid her in identifying ways to work smarter in how she does her job" does not include a specific request within it, but Lemieux further notes that LMG did not inquire further from Lemieux what feedback she was requesting.

is not vague and certainly, to have Winfrey re-write *a few* of Lemieux's case notes would not have been an undue burden on the Department[5].

LMG spends much time arguing that it had provided Lemieux with training and feedback on completing case notes, including meeting with Lemieux to answer any questions she may have had. LMG notes that "none of Lemieux's supervisors' support or feedback resulted in her being able to perform the essential functions of her position," but again, LMG fails to address that the accommodation requests Lemieux made in 2020 were at least in part *a specific form of support sought* that it had not provided to Lemieux – here, rewriting a few case notes as examples for her to follow and creating a daily task list or schedule for Lemieux.

Additionally, Lemieux requested a change to her schedule to allow her to work from 9:30am to 6:30pm. While this would have provided Lemieux with the same number of working hours, her request for a change in schedule was to allow her to work during hours of increased attentiveness. Indeed, shortly after beginning her third ADA request, Lemieux was disciplined for tardiness, and in her deposition, Lemieux explained that she had difficulty operating in the morning. [Lemieux Dep. at 74]  A change in schedule is not a vague request and is plausible as an accommodation, and it is listed as a possible accommodation in the statute. See 42 U.S.C. § 12111(9)(B); *see also Holt v. Olmsted Twp. Bd. of Trustees*, 43 F. Supp. 2d 812, 823 (N.D. Ohio 1998). Further, while Lemieux requested pushing back both her start and end times, Williams testified that it would have been an option to start at 9:30am and take a shorter lunch to leave by 6pm (which was Lemieux's schedule end time already). [Williams Dep. at 44] However, this was never offered as an option to Lemieux. [Lemieux Decl. ¶13]

---

[5] As Defendant acknowledges, Lemieux's previous supervisor in a different department, Travis White, *did* re-write a case note for Lemieux which shows that it was something possible for LMG to provide.

Finally, the request from Lemieux's medical provider for LMG to support her in making a daily schedule to complete tasks on time is not vague, and a request for a list of tasks can be a reasonable accommodation under the ADA.[6] As outlined below, Lemieux sought assistance in this task much like had previously been provided from her earlier supervisor which shows that the request itself was a plausible request that's benefit outweighed its cost. Lemieux has sufficiently articulated plausible accommodations for her disability. At the very least, there is a question of fact as the reasonableness of Lemieux's accommodation requests.

### 3. LMG has Not Met Its Burden to Show that Lemieux's Requested Accommodations Would Pose an Undue Burden on LMG.

Next, LMG argues that providing support to Lemieux beyond what it was already providing would cause undue burden on it. Once Lemieux met her initial burden to show that the proposed accommodation was "reasonable," the burden then shifts to LMG to prove that the accommodation would amount to an undue burden. *Rorrer v. City of Stow*, 743 F.3d 1025, 1045 (6th Cir. 2014) The ADA defines "undue hardship" as "an action requiring significant difficulty or expense, when considered in light of the[se] factors":

> (i) the nature and cost of the accommodation needed"; "(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility"; "(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities"; and "(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity."

[6] See https://askjan.org/disabilities/Attention-Deficit-Hyperactivity-Disorder-AD-HD.cfm?cssearch=4684137_1 (Listing "providing to-do lists" as a possible accommodation for individuals with ADHD who struggle with time management)(Last visited 10/13/23).

42 U.S.C. § 12111(10); *Equal Emp. Opportunity Comm'n v. Red Roof Inns, Inc.*, No. 3:20-CV-381, 2022 WL 3369519, at *8 (S.D. Ohio Aug. 16, 2022)

Managing her caseload was an essential function for Lemieux in her role as a Senior Social Worker, and through her request for accommodations, Lemieux laid out accommodations that she believed would help her do exactly that. Whether the requested accommodations were reasonable in a question of fact for the jury to decide. LMG, in denying the requests, argued that providing Lemieux's requests would have resulted in shifting an essential function of her job to Lemieux's supervisor and thus place an undue hardship upon her. LMG essentially read into Lemieux's third accommodation request items that were not there. Lemieux, in her request, did not request for her supervisor to re-write *all* her case notes; instead, she asked for her supervisor to re-write *a few* so that Lemieux could compare and understand better what was to be included. [Defendant's Exhibit 25, Memorandum Response 8.24.20] Further, Lemieux was not requesting that her supervisor write her a daily task list or schedule *each day*. Instead, she was seeking more of an outline of daily tasks to help her stay on course. If this was unclear to Williams, she did nothing to attempt to clarify the request after Williams received it and was asked to respond, as Williams did not discuss Lemieux's third accommodation request with her. [Williams Dep. at 43]

After receiving her requests, Williams denied almost all of her requests and did not offer any alternatives or other possibilities for Lemieux to consider and essentially, LMG ended the interactive process. Lemieux, by her requests, was not asking for the Department to essentially do her job for her and was not asking for her duties to be shifted to another employee. Lemieux made specific requests for tools that she believed would help her manage her caseload and complete her job duties and LMG denied those reasonable accommodation requests improperly. An "undue hardship is something greater than hardship, and an employer does not sustain his burden of proof

25

merely by showing that an accommodation would be bothersome to administer or disruptive of the operating routine." *Crider v. Univ. of Tennessee, Knoxville*, 492 F. App'x 609, 613 (6th Cir. 2012) (quoting *Draper v. United States Pipe and Foundry Co.*, 527 F.2d 515, 520 (6th Cir.1975) (internal quotation marks omitted). Lemieux has put forth sufficient evidence that she was qualified for her position with her proposed reasonable accommodations and LMG has not set forth specific facts indisputably demonstrating that such accommodations would have resulted in "significant difficulty or expense." *See Equal Employment Opportunity Commission v. Red Roof Inns, Inc.* 2022 WL 3369519 at *14. At least, whether Lemieux's requested accommodations would impose an undue hardship on LMG is also a question of fact for a jury, and as so, Defendant's Motion should be denied.

### C.   LMG is Not Entitled to Summary Judgment on Lemieux's Disparate Treatment Claims as LMG Did Not Move for Judgment on Either Claim.

Lemieux also clearly pled disparate treatment claims relating to her demotion in 2018 and her termination in 2021.   A failure to accommodate claim is distinct from a disability discrimination claim, in part, because it requires direct evidence of discrimination. *Lockhart v. Marietta City Sch.*, No. 2:19-CV-2935, 2020 WL 6782209, at *15 (S.D. Ohio Nov. 18, 2020), aff'd, No. 20-4308, 2021 WL 4810172 (6th Cir. Oct. 15, 2021). Fed. R. Civ. Proc. 56(a) states that a party may move for summary judgment, identifying *each claim or defense* on which summary judgment is sought. LMG states in its brief that Lemieux "brings a single cause of action under the ADA (incorrectly identified as Title VII) and the Kentucky Civil Rights Act claiming that LMG failed to accommodate her…" [See Def's Brief, page 15] LMG did not address Lemieux's claims of disparate treatment relating to her demotion and/or termination of employment and as such, both claims survive Defendant's motion for summary judgment.

In her Complaint, Lemieux clearly alleges disparate treatment claims under both the ADA and KCRA. In paragraph 22, Plaintiff alleges, "Plaintiff suffered one or more adverse employment actions. Specifically, Defendant failed to accommodate Plaintiff's disability and subjected her to disparate treatment, resulting in her termination due to an actual or perceived disability. As such, Plaintiff was wrongfully terminated because Defendant failed to accommodate her disability." (Complaint, Dkt. No. 1).[7] Lemieux also clearly pled facts to support her disparate treatment claim, alleging that other members of her team who also failed to complete case files and meet the 80% minimum monthly client contact rate were not disciplined. (Complaint ¶19, Dkt. No. 1). Defendant fails to identify Lemieux's disparate treatment claims as ones it seeks summary judgment upon so both of these claims should proceed to trial.[8]

## IV.  CONCLUSION

Lemieux has presented sufficient evidence and pertinent legal authorities to demonstrate that there are genuine issues of material fact that preclude the grant of summary judgment on her claims that LMG failed to accommodate Lemieux's disability in 2020. For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied. As LMG did not move for summary judgment on Lemieux's disparate treatment claims, both should proceed to trial.

---

[7] In Count II, alleging violation of the KCRA, Plaintiff similarly alleges that Defendant discriminated against Plaintiff by subjecting er to disparate treatment resulting in her demotion and later termination.

[8] If the Court was to find that LMG properly moved for summary judgment on Lemieux's disparate treatment claims, Lemieux requests that she be able to provide supplemental briefing on this issue. To establish discriminatory discharge, the ADA requires the plaintiff to show: A prima facie case for Perry's disability discrimination claim based on disparate treatment requires a showing that: (1) she is disabled; (2) otherwise qualified for the position; (3) she suffered from an adverse employment decision; (4) the employer knew or had reason to know of her disability; and that (5) similarly situated non-protected employees were treated more favorably. *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 660 (6th Cir. 1999); *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995). As addressed above, LMG does not challenge that Lemieux is disabled. There can also be no dispute that LMG knew of Lemieux's disability or that she suffered adverse employment actions in both 2018 when she was demoted and 2021 when she was terminated. For the same reasons as argued above, Lemieux was otherwise qualified for her position had she properly received the requested reasonable accommodations, and as outlined, other Senior Social Workers on Lemieux's team failed to meet the minimum client contact rate and were not disciplined.

Respectfully submitted,

_s/ Lauren E. Berger_____
Andrew Dutkanych, Atty. No. 91190
Lauren E. Berger, admitted *pro hac vice*
BIESECKER DUTKANYCH & MACER, LLC
411 Main Street
Evansville, Indiana 47708
Telephone: (812) 424-1000
Facsimile:  (812) 424-1005
Email: ad@bdlegal.com
          lberger@bdlegal.com

*Attorneys for Plaintiff*

### CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2023, a copy of the foregoing was filed electronically.  Service will be made electronically on all ECF-registered counsel of record via email generated by the Court's ECF system.

McBRAYER PLLC
Cynthia L. Effinger, ceffinger@mcbrayerfirm.com

s/ Lauren E. Berger___
Lauren E. Berger