UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:22-cv-00151-RGJ-CHL

MARIANA LEMIEUX                                                                                            PLAINTIFF

v.

LOUISVILLE METRO GOVERNMENT                                                                  DEFENDANT

### REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Comes the Defendant, Louisville Metro Government ("LMG"), by counsel, and for its Reply in Support of Motion for Summary Judgment states as follows:

**I.  LEMIEUX HAS NOT RAISED A GENUINE ISSUE OF FACT REGARDING HER CLAIMS FOR FAILURE TO ACCOMMODATE AND DISABILITY DISCRIMINATION.**

**A.  Any Request for "Clear Communications" Was Not an Accommodation for a Disability Under the ADA or Kentucky Civil Rights Act.**

Throughout her Response, Lemieux admits that the request for "clear communications" was not an accommodation for her *disability*, but rather, to address her perception that the policies that governed her job were not clear, and that her supervisors did not communicate clearly.[1] Indeed, there is no dispute on this issue: "Lemieux did testify that her supervisor's contrary

---

[1] The following excerpts from Lemieux's Response are examples of her acknowledgment that the request for "clear communications" was not – and could not be – a request for a disability accommodation:  (1) Lemieux testified that "the policies which guided her work were not clear."  (Response at 5); (2) Lemieux testified that "there was a difference between the verbal communication she was receiving from her supervisor and the written communications."  (Response at 6); (3) "The SOP Checklist at issue had been undergoing changes during this time frame and had actually been addressed by a committee of Senior Social Workers because it lacked detail."  (Response at 7; *see also* Response at 17); (4) "Lemieux testified that 'things changed all the time with [her supervisor], the way that she had me doing things could be altered.  I mean, it was altered and so this nice neat little way that looks like we're supposed to do things … in reality did not happen that way."  (Response at 8); (5) Her supervisor "frequently gave the Senior Social Workers … conflicting information and was a poor communicator.  In fact, [her supervisor] received coaching … for her communication style."  (Response at 11); (6) "Management gave inconsistent directives regarding what Lemieux was to complete each month with clients."  (Response at 16); and (7) Lemieux testified that "over the time she was supervised by Winfrey, she was *not* provided clear guidance; instead she received conflicting guidance from Winfrey and Williams as it related to the policies and procedures that guided how she completed her job duties."  (Response at 21; emphasis added).

instructions caused her issues **which is why she sought clear written instruction** because 'when there is clear communication – when the expectations are clear then it makes your work easier because you know exactly what [sic].'" (Response at 5; emphasis added). Although in her Response Lemieux attempts to tie this alleged poor communication to her impairment, (Response at 8), such argument is completely contradicted her own testimony:

> A. ***Part of the problem is that her – that Laura was saying one thing and Lisa was saying another.***
>
> Q. So that has nothing to do with your impairment, that's more of a communication issue, right? If Laura is saying one thing and Lisa is saying another –
>
> A. But that affects how I do my job because one person is saying, okay, you need to get this person housing like by Friday.
>
> Q. You don't need an accommodation for that. That is one –
>
> A. But it's not clear and concise communication. ***It's getting two different messages from people.***
>
> Q. Right, absolutely, but it has nothing to do with your impairment. That is a communication issue between Laura, your supervisor, and Lisa, the administrator.
>
> \*\*\*
>
> Q. ***That communication issue had nothing to do with your impairment, right? Your impairment didn't affect their ability to communicate with you.***
>
> A. ***Right.***

(Lemieux depo., at 256-57; emphasis added). Accordingly, there is no dispute that the request for "clear communications" was merely a *communication* issue, and not an issue related to any *disability*. In light of Lemieux's admissions, LMG is entitled to summary judgment on the failure

to accommodate claim to the extent the request was for her supervisors to communicate "clearly,"[2] refrain from providing conflicting instructions.

> **B.     Lemieux's Rejection of Her Doctor's November, 2017 Request for Extra Time Entitles LMG to Summary Judgment.**

The law is clear that "[i]f a disabled employee requires an accommodation, the employee is saddled with the burden of proposing an accommodation and proving that it is reasonable. Furthermore, the plaintiff has the burden of proving that he will be 'capable of performing the essential functions of the job with the proposed accommodation.'" *Jakubowski v. Christ Hosp. Inc.*, 627 F.3d 195, 202 (6th Cir. 2010)(citations omitted).  Lemieux has failed to meet her burden and present evidence from which a jury could conclude that she proposed a reasonable accommodation that would allow her to perform the essential functions of her job.

After being notified of the disciplinary action for falling behind on her case load in November, 2017, Lemieux contacted human resources seeking accommodations for a new ADHD diagnosis. This new diagnosis followed a "full and comprehensive evaluation" for "difficulty (at work) related to keeping up with her paperwork." (DN 26-5, page 1; *see also* Lemieux depo., at 99). As a result of this evaluation, Lemieux's psychologist, Dr. Lee Epstein, made specific recommendations for Lemieux to implement on her own accord (use of a calendar and visual prompts, establishing routines, and reading educational materials). (DN 26-10, page 2). Lemieux attempts to downplay this evaluation, and characterizes Dr. Epstein's recommendations "generic." (Response at 10).  However, most of these recommendations were not accommodations that should, or could, be provided by LMG, but instead tools that Lemieux should, and could, employ herself.  In addition to these tools, Dr. Epstein recommended that LMG provide Lemieux with

---

[2]     Alternatively, the request for "clear instructions" would be too vague of an accommodation request to be reasonable.  (*See* Memorandum in Support of Motion for Summary Judgment at pp17-21, DN 26-1).

"extra time" to complete tasks. Importantly, this is the only true accommodation request made by Dr. Epstein or Lemieux. However, Lemieux expressly *rejected* this accommodation because she believed it would not assist her in being performing the essential functions of the job: "I was like I don't know what I need, because I didn't want to ask for [extra time], honestly, because I think something in me said that that's not going to help, it's not what you need." (Lemieux depo., at 168-69; *see also id.* at 170; and DN 26-11, page 2). Indeed, Lemieux specifically informed human resources that she did not want extra time. (DN 26-11; *see also* Lemieux depo., at 170). In other words, Lemieux did not believe that "extra time" would assist her in performing the essential functions of the job.

After rejecting the accommodation, Dr. Epstein and Lemieux *decided to withdraw the accommodation request altogether*: "It was our decision together that Mariana would try to resolve some of her issues with the assistance of her support supervisors. Rather than make specific recommendations at this point in time." (DN 26-12). Accordingly, because Lemieux rejected and withdrew the accommodation request, there is no evidence from which a jury could conclude that LMG failed to accommodate Lemieux's disability in November, 2017.

In an attempt to avoid the inescapable conclusion that LMG did not fail to accommodate her November, 2017 request, Lemieux improperly argues that the burden was on LMG, not her, to propose a reasonable accommodation, and that LMG failed to assist her with the accommodation request. (Response at 2, 6, 10). Even if the burden were on LMG, her argument is not supported by the evidence. Human resources engaged in the interactive process with Lemieux. Lemieux received the appropriate paperwork to apply for accommodations, and had multiple phone interviews to explain and understand her request. Human resources followed up with Lemieux to obtain additional information from her psychologist for additional clarification. These phone

4

conversations were transcribed and attached as exhibits to LMG's Motion for Summary Judgment. (DN 26-11, 26-13, 26-17, and 26-18). Furthermore, Lemieux's argument contradicts her own testimony. Lemieux candidly admitted that *she did not know* what accommodations she needed, and had "difficulty articulating" her accommodation request. (Response at 6, 10; *see also* DN 26-11, and Lemieux depo., at 170). As such, Lemieux failed to meet her burden by being unable to propose a reasonable accommodation that would assist her in performing the essential functions of her job. This admission that she did not – and could not – propose an accommodation that would assist her in performing the essential functions of her job entitles LMG to summary judgment as it relates to claim that LMG failed to accommodate Lemieux in November, 2017.

    **C.**    **There is No Evidence that the February, 2018 Demotion was Discriminatory.**

For over a year prior to her demotion, Lemieux had documented performance issues related to an inability to submit case reports on time. (DN 26-3). These issues began in July, 2016, and subjected her to discipline in the form of reprimands, warnings, and suspensions. (*Id.*). In November, 2017, Lemieux was again subjected to discipline for failing to submit timely case. (DN 26-6). Lemieux does not dispute that she failed to submit reports on time, and that such conduct warranted discipline. (Lemieux depo., at 243, 246). After being notified of disciplinary action, Lemieux sought the accommodation of "clear communications." Even if this were a reasonable accommodation, the request itself cannot insulate her from discipline. (Lemieux depo., at 230). The demotion followed a year of Lemieux's *admitted* failure to meet job expectations. Lemieux's admission leaves no issue of fact from which a jury could conclude that the demotion was discriminatory, and therefore, LMG is entitled to summary judgment on the disability discrimination claim.

> **D.  Lemieux's 2020 Accommodation Request was Unreasonable and/or Created an Undue Hardship on LMG.**
>
> **1.  To the Extent that the 2020 Accommodation Request was to Address Lemieux's Supervisors' Communication Style, It is Not Covered by the ADA or Kentucky Civil Rights Act.**

In June, 2020, after having been promoted back to the Senior Social Worker position from which she was demoted, and despite having accommodations in place[3], Lemieux fell behind in her case work, again. (Response at 12). Although Lemieux understood that a request for an accommodation could not be used to avoid discipline for failure to meet expectations, (Lemieux depo., at 149-50; 206; 230), she nevertheless opened up another accommodation request because "she did not want to be written up or be penalized due to the handling of her workflow." (DN 26-18, page 1). At this time, Lemieux identified similar issues she had experienced in the past – that her supervisors were not clear in their communications with her *or any of her co-workers*, and otherwise provided conflicting instructions:

> Q.  So it was the same communication issue you had with all of your other supervisors?
>
> A.  But Laura was different. No. She was different.
>
> Q.  But she was not communicating – she was communicating poorly with you.
>
> A.  With everybody…She was not clear.
>
> Q.  *It had nothing to do with your impairment, she was a poor communicator.*
>
> A.  *Well, I don't know how much of it – yeah, I don't think it had to do with my impairment.*

(Lemieux depo., at 244; emphasis added). In addressing this 2020 accommodation request, Lemieux focuses on her *supervisors' poor communication instead of her impairment*: "LMG

---

[3] These accommodations included: the use of a timer, the ability to close her door to avoid distractions, and the use of a calendar to track tasks. (Lemieux depo., at 219-21).

argues that Lemieux did not identify how providing the purported accommodations would allow Lemieux to fulfill the essential functions of her position, arguing that LMG offered Lemieux support along the way and provided her with clear expectation. To the contrary, Lemieux testified that over the time she was supervised by [Laura] Winfrey, she was not provided clear guidance; ***instead, she received conflicting guidance from [her supervisors] as it related to the policies and procedures that guided how she completed her job duties."*** (Response at 21; emphasis added). Accordingly, by her own admission, the proposed accommodation had nothing to do with her impairment at all. Instead, her complaint was that her supervisors provided "conflicting guidance" about policies and procedures to both her and her co-workers. For this, she sought an "accommodation" to require her supervisors to communicate differently with her (and her co-workers). Accordingly, just as with her November, 2017 accommodation request, the focus was not on Lemieux's *impairment*, but rather, her supervisors' communication. To the extent that the 2020 accommodation request is based upon Lemieux's conflicting communications, it is not covered by the ADA or the Kentucky Civil Right Act, and LMG is entitled to summary judgment.

### 2. Lemieux's Accommodation Requests were Too Vague.

Lemieux also fails to address or challenge any of the case law cited by LMG with regard to the vagueness of the accommodation requests. Vague requests such as "additional feedback," "support" or to "work with" the employee are not reasonable. *See McDonald v. UAW-GM Center for Human Resources*, 738 Fed.App'x 484 (6th Cir. 2018); *Cassidy v. Detroit Edison Co.*, 138 F.3d 629 (6th Cir. 1998); *Palmer v. Marathon Petroleum Company, LP*, 2018 Wage & Hour Cas.2d (BNA) 376, 886, 2018 WL 4956110 *11 (E.D.Ky. Oct. 12, 2018); 29 C.F.R. §1630.2(o)(1)(ii); *Keys v. Joseph Beth Booksellers, Inc.*, 173 F.3d 429 (6th Cir. 1999); and *Jakubowski v. Christ Hosp. Inc.*, 627 F.3d 195 (6th Cir. 2010). Employees are required to identify their limitations and propose

a defined accommodation. Moreover, employees must demonstrate that the accommodation will eliminate an obstacle in performing the essential functions of the job. *Hagan v. Anderson County Fiscal Court*, 105 F.Supp.2d 612 (E.D.Ky. 2000). Lemieux's 2020 accommodation request fell far short of her burden.

### a. The Request for "Feedback"

Lemieux's accommodation request for "Feedback from my supervisor as appropriate that could aid me in identifying ways to work smarter in how I am doing my job" was not an accommodation request at all. (DN 26-19). Indeed, Lemieux acknowledges that the request for "feedback" to "work smarter" was too vague to be accommodated. (Response at 22, footnote 4). Furthermore, Lemieux acknowledged that she had, and took advantage of, the opportunity to meet with her supervisors and ask for feedback on a regular basis. Her supervisors had an open door policy, and that they met with her at least once a month at which time she could seek any feedback desired. (Lemieux depo., at 253). There is no evidence in the record to determine that additional "feedback" was a necessary or reasonable accommodation, or that such feedback beyond what was already available to Lemieux would allow her to perform the essential functions of her job. (*See also* DN 26-26). Accordingly, the denial of the accommodation request for "feedback" was not wrongful.

### b. The Request for "Support"

Similarly, the accommodation of "support" in becoming more efficient in writing reports was unreasonable and created an undue burden. This request was just as vague as the request for "feedback," and therefore, was not reasonable.

Furthermore, Lemieux did not demonstrate how this "support" would assist her in performing the essential functions of her job given the amount of training and support she had

8

been receiving. (*See* DN 26-26). Lemieux acknowledged that she had performed the Senior Social Worker job for over a decade, and had her supervisor re-write a report to provide her with guidance. (Lemieux depo., at 134-35; 232-33; *see also* DN 26-8). This guidance, however, did not assist her in submitting the case reports on time. (DN 26-14). LMG also noted that her supervisors provided her with examples of case notes and other guidance which did not help her to submit reports on time. (DN 26-26; Williams depo., at 39, 40). As noted by LMG, Lemieux's challenge was not that she did not know how to write a case report, but rather an inability to complete the report *on time*. (DN 26-26). Even Lemieux admitted that this she struggled with timeliness her entire life, and called it her "Achilles heel." (Lemieux depo., at 52). Accordingly, LMG's denial of the request was not wrongful as Lemieux has not demonstrated that "support" in rewriting case notes would assist her in in submitting reports on time.

### d. The Request for A Daily Task List

Lemieux's request that her supervisor create a daily task list was also unreasonable and/or created an undue burden. Lemieux's admitted that an essential duty of her job was to manage her caseload. (Response at 25). Shifting essential duties to another employee is *never* reasonable. *See Russ v. Memphis Light Gas & Water Division*, 702 Fed.Appx. 229 (6th Cir. 2017); *see also Bratten v. SSI Services, Inc.*, 185 F.3d 625, 632 (6th Cir. 1999)("Courts have continuously found that employers are not required to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability."). Lisa Williams, ("Williams"), Lemieux's Program Manager, testified that: "as a Senior Social Worker, it's their responsibility to manage their schedule, to be able to anticipate client needs, to be able to take the policy and apply it to their daily work, and to give her a daily list of tasks is what she should be producing for herself like all the other Senior Social Workers."

(Williams depo., at 50). Williams also noted that the daily tasks of a Senior Social Worker are "fluid," and not subject to a regular routine: "you're dealing with – providing support to some of the most vulnerable people in the city; right? And, so, on one day you might start just having a check-in conversation with a client, find out they're in crisis, and that diverts the whole day, but that doesn't mean that you don't also have to figure out how to adjust your schedule to support the other clients that you're also responsible for." (*Id.* at 50-51). Lemieux agreed with Williams' characterization of her daily schedule, and more importantly, admitted that ***she did not need help to keep a running list of her daily activities***:

> Q. And did you need anything from Metro Government or your supervisors in terms of an accommodation for you to be able to create these recurring time slots or keeping running lists or other tasks performed to, again, execute your plan to stay caught up?
>
> A. Well, to actually perform, to carry out like the wrap-up and the daily activity log, the running list, that is all things that I'm able to do on my own based on what I understand of how to be done, because it could vary depending on what's going on with the clients, ***if they're in crisis and stuff like that, sometimes you just have to change your plans, you have to adjust things***.
>
> Q. Of course, of course. That's part of the discretion that you have as a case manager.
>
> A. Yes.
>
> Q. But I just want to understand … ***you didn't need an accommodation to be able to create these time slots and keep the running list of tasks performed for each day, right?***
>
> A. ***Correct.***
>
>                             \*\*\*
>
> Q. But as it pertains to planning for the next day, you were able to do that without an accommodation, right?
>
> A. Yes.

(Lemieux depo., at 69-70; emphasis added). In other words, Lemieux admitted that her impairment did not prevent her from creating a daily task list, and therefore, was not an accommodation *related to her disability*. Accordingly, LMG's denial of this request was did not wrongful.

### e.  The Request to Change her Working Hours

Lemieux also complains that there was no burden associated with a change in her working hours from 9:00-6:00 to 9:30-6:30. (Response at 13, 23). Approximately a year earlier, LMG granted Lemieux a change in her working hours in order to accommodate her contention that her impairment made it difficult for her to get up in the morning.[4] However, Lemieux admitted that she did not know, and only "hoped," that moving her start time again would allow her to get to work on time on a regular basis. (Lemieux depo., at 77). Notwithstanding, LMG denied this request because it would create a safety issue due to the building closing at 5:00 p.m. Lemieux acknowledges that this safety issue was reasonable. (Lemieux depo., at 254-55). Consequently, there is no genuine issue of material fact as to whether LMG's denial of the accommodation request was reasonable. This acknowledgement, alone, entitles LMG to summary judgment on this issue.

To avoid her admission, in her Response, Lemieux claims for the first time, her start time could have remained at 6:00 if she only took a 30 minute lunch break. (Response at 13). This argument should be disregarded as it was not the accommodation requested by Lemieux in 2020. (*See* DN 26-19). Notwithstanding, this request was unreasonable because contradicted Lemieux's need for "extra" supervision. This new schedule would significantly *shorten* the amount of time she would have access to her supervisors. (DN 26-26). More importantly, however, LMG noted

---

[4] Lemieux claimed that she was "not good about making [herself] go to bed at a certain time," and requested a later start time, which was granted. (Lemieux depo., at 73).

that in her current schedule, Lemieux often worked more than 40 hours in the week[5], and nevertheless remained unable to submit reports on time: "The challenge is that extending the start and end time by another 30 minutes will not yield a reasonable return on investment for the additional COMP TIME that would have to be allocated for supervision." (*Id.*). Consequently, there is no evidence from which a jury could conclude that the extension of the working hours would have assisted Lemieux in performing the essential functions of the job, entitling LMG to summary judgment.

### f. LMG Demonstrated a Financial Burden Associated with the Accommodation Requests.

Finally, Lemieux has not challenged the undue burden identified by LMG in providing this extra support and feedback. In its denial of the accommodation requests, LMG calculated the financial cost of Lemieux's requests. In order to implement the accommodations, LMG would have to pay Lemieux and her supervisor to perform the essential functions of ***her*** job. (DN 26-26). In addition, the extra supervision could jeopardize LMG's federal funding and impact the supervisors' jobs:

> [I]n the context of the office, the supervisor's work is already interrupted without schedule due to the open-door policy and folks being able to just walk up to our cubicle. To put another scheduled time on her – on her schedule above and beyond the one-on-ones that she's already doing for eight or nine people, however many folks were on her team at the time, would just be an additional burden on her time that goes above and beyond what the standard support needs are for the whole team; and, so, in my assessment, because of the level that she was utilizing, the open-door policy, to have an additional sit-down was just redundant. You know, you already have the one-on-one. You're already asking questions about every case that you're working. We're already giving feedback on how to – you know, how to do everything repeatedly; so, that equates to additional one-on-one time.

---

[5] LMG also feared that Lemieux's after hours work would subject it to a claim for unpaid overtime, which would also create a financial burden. (DN 26-26).

(Williams depo., at 45-46). Accordingly, there is no dispute that the accommodation requests would have caused an undue burden on LMG.

## II.     LMG IS ENTITLED TO SUMMARY JUDGMENT ON THE DISPARATE IMPACT THEORY.

Lemieux alleges that she "clearly" pled a claim for disparate treatment, and LMG's failure to move for summary judgment on the claim leaves it intact. However, there was nothing "clear" about the alleged claim. Indeed, even Lemieux acknowledged that she was pursuing only two claims: "Lemieux filed her Complaint against LMG alleging that she was discriminated against on the basis of her disability when she was demoted in 2018 and terminated in January 2021. Further, Lemieux alleges that LMG failed to reasonably accommodate her disability." (Response at 3). Moreover, Lemieux's Complaint contains nothing more than a bare legal conclusion that others were treated more favorably than her with regard to discipline. Her Complaint asserts no facts to support the allegations. In short, it was not altogether clear that Lemieux was pursuing a disparate treatment claim.

LMG is nevertheless entitled to summary judgment on this purported claim. LMG terminated Lemieux's employment for a failure to submit case reports on time and a failure to maintain the expected client contact rate. Lemieux admits that these reasons were factual. (Response at 17). She does not dispute that she failed to successfully complete the PIP, and that she remained behind in her case reports and client contact rate, and was fired as a result. Lemieux does not identify a single, similarly situated employee who was treated more favorably than her under similar circumstances. Notwithstanding this lack of evidence, Lemieux asserts a bare conclusion that other Senior Social Workers did not complete case files or meet the contract rate

and were treated more favorably. (Response at 17)[6]. Lemieux does not identify these individuals nor does she provide any factual support for her assertion. Instead, she refers this Court to the testimony of Williams.[7] However, Williams' testimony does not support a claim for disparate treatment. Williams acknowledged that one other Senior Social Worker failed to submit case reports in a timely manner and did not meet the client contact rate. Williams placed this Social Worker on a PIP just as she had Lemieux. (Williams depo., at 40-41; 88-89). Unlike Lemieux, however, this Senior Social Worker successfully completed the PIP and caught up on the items that were behind. (*Id.* at 41, 92). Lemieux admitted to "missing the goal," distinguishing her performance from the other Senior Social Worker who was not fired. (Response at 17). Accordingly, Lemieux has not produced any evidence from which a jury could conclude that she was treated less favorably than a similarly situated, non-protected employee, entitling LMG to summary judgment on the claim for disparate treatment.

## CONCLUSION

For the forgoing reasons, LMG respectfully requests this Court grant its Motion for Summary Judgment.

---

[6] In her Response, Lemieux argued against summary judgment on this claim despite asserting that LMG did not so move.

[7] Lemieux took no discovery on this purported claim. Indeed, Lemieux took no depositions in this case until *after* LMG moved for summary judgment. At that time, she only requested the deposition of Williams which failed to adduce any evidence that other similarly situated employees were treated more favorably than Lemieux.

Respectfully submitted,

*/s/ Cynthia L. Effinger*
CYNTHIA L. EFFINGER (KBA #87298)
McBRAYER PLLC
500 W. Jefferson Street, Suite 2400
Louisville, Kentucky 40202
Ph: (502) 327-5400
Fax: (502) 327-5444
Email: ceffinger@mcbrayerfirm.com
**Counsel for Defendant**

## CERTIFICATE OF SERVICE

I certify that on November 3, 2023, the foregoing was electronically filed with the Clerk of Court using the CM/ECF which will send notice of electronic filing to the registered counsel.

*/s/ Cynthia L. Effinger*
Cynthia L. Effinger
**Counsel for Defendant**

4891-0839-1564, v. 1

15