UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

MARIANA LEMIEUX     Plaintiff

v.     Civil Action No. 3:22-cv-151-RGJ

LOUISVILLE METRO GOVERNMENT     Defendant

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Defendant, Louisville Metro Government ("LMG"), moves for summary judgment. [DE 26]. Plaintiff, Mariana Lemieux ("Lemieux"), responded and LMG replied. [DE 29; DE 32]. The Court granted summary judgment on Lemieux's failure-to-accommodate claim but allowed supplemental briefing on Lemieux's disparate treatment claim. [DE 34]. Lemieux filed a supplemental response and LMG filed a supplemental reply. [DE 35; DE 36]. For the reasons below, LMG's motion for summary judgment on the disparate treatment claim is **GRANTED**.

**I.**     **Background**

This matter originates from Lemieux's complaint [DE 1] against her former employer, LMG, alleging two counts of disability discrimination—one under the Americans with Disabilities Act ("ADA") and one under the Kentucky Civil Rights Act ("KCRA"). 42 U.S.C. § 12101; KRS § 344.040. Lemieux began working for LMG in 2001 as a Senior Social Worker. [DE 29 at 251]. During her employment in 2017, Lemieux was diagnosed with attention deficit hyperactivity disorder – inattentive type ("ADHD"). [*Id.*]. Because of her ADHD diagnosis, Lemieux formally requested accommodations from LMG on three occasions. [*Id.* at 251–53; DE 26-1 at 101]. Ultimately, she was demoted in 2018, returned to her old role in 2020, and eventually terminated in 2021. [DE 1 at 3; DE 29 at 253]. Lemieux's complaint alleges that LMG "subjected her to

1

disparate treatment, resulting in her termination due to an actual or perceived disability" and that "other similarly situated, non-protected employees were not subjected to the same treatment." [DE 1 at 4–5].

In her second stint as a Senior Social Worker, Lemieux was first disciplined on August 3, 2020 in a meeting that was preceded by at least four 1:1 supervision meetings to support Lemieux in prior months. [DE 26-20 at 211]. This disciplinary documentation explained that Lemieux had until October 1, 2020 to be completely "caught up," and contained preliminary deadlines of August 31, 2020 and September 30, 2020 to complete 16 case files each. [*Id.*]. Lemieux was then placed on a Performance Improvement Plan ("PIP") addressing "Job Knowledge" on September 4, 2020, which focused on her client contact rate and continuing to utilize one-on-one monthly supervisory meetings. [DE 26-21 at 214–16]. On September 21, 2020, Lemieux was placed on a separate PIP addressing "Work Quality," which focused on timely submitting files. [*Id.* at 217–20]. Lemieux received a twenty-day suspension in early October after continued performance issues including submitting no files at all on September 21, 22, 23, 24, and 25 of 2020. [DE 36-2 at 488]. On December 11, 2020, Lemieux received another disciplinary update highlighting continued performance issues with timeliness of file submissions and client contact rate, which accompanied another PIP describing these same concerns. [DE 26-22 at 222–28]. Lemieux asserts that her immediate supervisor, Laura Winfrey ("Winfrey"), did not conduct most of her scheduled follow-up meetings with Lemieux as part of the December 11, 2020 PIP, completing only two of five scheduled follow-up meetings. [DE 29-2 at 326, 330]. In January 2021, Lemieux acknowledged that she had "not met the goals established in my plan," despite believing that she had made "improvements" in her job. [DE 29-2 at 338].

Throughout the period after her ADHD diagnosis, Lemieux experienced difficulties with her supervisors. LMG's case management operating procedures were "in a state of flux" during this time, going through a revision process from 2019 to 2020, [DE 29 at 267; DE 29-3 at 342], and Lemieux's supervisors often failed to communicate clearly. [DE 29 at 258; DE 29-1 at 283; DE 35-1 at 466]. Lemieux's supervisor, Lisa Williams ("Williams"), testified that the policies were clear in their original version, only not "as detailed." [DE 35-1 at 462]. Williams explained that the social workers wanted the operating procedures to be less of a "narrative" document and contain more step-by-step instructions, but that there was "nothing new in this policy and procedure" even with the revisions. [*Id.* at 462, 465]. Williams also confirmed that Winfrey did struggle with "clear and concise communication" and "consistency." [*Id.* at 466].

Lemieux alleges that other social workers on her team failed to complete their case files on time and meet the minimum monthly client contact rate, but that these coworkers were not disciplined. [DE 1 at 4; DE 29 at 267; DE 29-3 at 346]. Williams also placed one of Lemieux's coworkers, Cherie Lawrence ("Lawrence"), on a PIP. [DE 35 at 452; DE 35-1 at 463]. While Lemieux was placed on a PIP after LMG initiated disciplinary steps against her, Lawrence was placed on a PIP without similar disciplinary steps being taken. [DE 35 at 454; DE 35-1 at 463]. Lawrence completed her PIP with no extensions. [DE 35-1 at 463, 465]. Williams said that "[Lawrence] decided she needed more direction; so, we put her on a [PIP] and she got it together. She was able to make the adjustment and was, you know, successful." [DE 35-1 at 465]. Lemieux failed to meet her PIP targets, never completing one. [DE 26-22; DE 36-2]. Lawrence was the only other social worker under Williams to be placed on a PIP for consistently not meeting the eighty-percent client contact rate and struggling with timeliness. [DE 35-1 at 465].

## II. Discussion

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the nonmoving party must produce specific facts showing a material issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion." *Bell v. City of E. Cleveland*, 125 F.3d 855, 1997 WL 640116, at *4 (6th Cir. 1997) (citing *Liberty Lobby*, 477 U.S. at 252).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *See Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008); *see also Adams v. Metiva*, 31 F.3d 375, 384 (6th Cir. 1994). The Court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). But the nonmoving party must do more than show some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1); *see also Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 131–32 (6th Cir. 2014). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Liberty Lobby*, 477 U.S. at 252.

Rule 56(c)(1) requires that a "party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

### A. Disparate Treatment Standard

"Because the language of the KCRA mirrors that of its federal counterpart, courts interpret the KCRA consistently with federal anti-discrimination law." *Brown v. Humana Ins. Co.*, 942 F. Supp. 2d 723, 730 (W.D. Ky. 2013) (citing *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003) and *Brohm v. JH Props., Inc.*, 149 F.3d 517, 520 (6th Cir. 1998)). "Accordingly, the Court will analyze this . . . claim under the framework provided by the [ADA]." *Id.*

"[D]isparate treatment arises from employees treat[ing] some people less favorably because of their . . . [protected characteristics]" and "require[s] a plaintiff [to] show proof of intentional discrimination." *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 818 (6th Cir. 2020) (quoting *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) and *Anderson v. City of Blue Ash*, 798 F.3d 338, 363–64 (6th Cir. 2015)) (internal quotation marks omitted); *see also O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 619 (6th Cir. 2020) ("Disparate treatment and retaliation claims are indirect-evidence claims based on circumstantial evidence where the determinative issue is the employer's intent.").

A disparate treatment claim is "evaluated under" the *McDonnell Douglas* "burden-shifting framework." *O'Donnell*, 833 F. App'x at 619 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). That framework requires:

> In order to establish a prima facie claim of disparate-treatment disability discrimination under the ADA, [Lemieux] must show that 1) she was disabled; 2) she was otherwise

qualified for the job, with or without reasonable accommodation; 3) she suffered an adverse employment decision; 4) her employer knew or had reason to know of her disability; and 5) similarly situated employees were treated more favorably.

*Id.* (citing *Rosebrough v. Buckeye Valley High Sch.*, 582 F. App'x 647, 651 (6th Cir. 2014)). Because the *McDonnell Douglas* framework applies to disparate treatment claims for multiple types of discrimination, courts often look to how the framework is applied in one context to determine its application in another.[1] *See, e.g.*, *Waggoner v. Carlex Glass Am., LLC*, 682 F. App'x 412, 415 (6th Cir. 2017) (citing *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006), which dealt with sex discrimination, to resolve an ADA claim); *Equal Emp. Opportunity Comm'n v. Dolgencorp, LLC*, 277 F. Supp. 3d 932, 945 (E.D. Tenn. 2017), *aff'd*, 899 F.3d 428 (6th Cir. 2018) (citing *Key v. Cincinnati Hamilton Cty. Cmty. Action Agency*, No. 1:09–CV–139, 2011 WL 4543892, at *10 (S.D. Ohio 2011), which dealt with race and age discrimination, to resolve an ADA claim).

### B. Disparate Treatment Claim

Lemieux has established a *prima facie* case (and LMG does not dispute) that Lemieux was disabled, suffered an adverse employment decision, and her employer had reason to know of her disability. [DE 35 at 450]. The only elements of Lemieux's *prima facie* case argued by either

---

[1] As explained in *Lewis v. Humboldt Acquisition Corp., Inc.*:
> Simply put, the ADA was enacted to expand the protection against discrimination beyond that afforded by Title VII, in order to provide the same remedies offered to individuals discriminated against on the basis of race, color, religion, sex, and national origin to those discriminated against on the basis of their disabilities. *See* 42 U.S.C. § 12101. The ADA explicitly cross-references and adopts Title VII's enforcement section, including "powers, remedies, and procedures." 42 U.S.C. § 12117(a) ("The powers, remedies, and procedures set forth in sections 2000e–4, 2000e–5, 2000e–6, 2000e–8, and 2000e–9 of this title shall be the powers, remedies, and procedures [of] this subchapter...."). Title VII's remedies thus apply to the ADA with equal force and validity; this includes the changing interpretation of Title VII and any amendments made thereto.

681 F.3d 312 (6th Cir. 2012) (Clay, J., concurring).

party are whether (1) Lemieux was otherwise qualified for the job and (2) other similarly situated employees were treated more favorably.

### i. Otherwise Qualified for the Position

It does not appear that LMG disputes that Lemieux was "otherwise qualified" for the job. Regardless, Lemieux has established that she was. While the Court has already discussed Lemieux's job performance as it related to her failure-to-accommodate claim, [*See* DE 34], to consider that performance here would "impermissibly conflate[] the non-discriminatory reasons for termination with the qualifications for the job." *Gaglioti v. Levin Grp., Inc.*, 508 F. App'x 476, 480 (6th Cir. 2012) (citation omitted). That is because "the standard for determining whether an employee is qualified for a position is whether the plaintiff 'present[s] credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field.'" *Id.* (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir.2003) (en banc)). As Lemieux points out, she worked in the role of Senior Social Worker for over sixteen years and was promoted to the same role again in 2020 after her demotion. [DE 35 at 451]. This is enough to establish a *prima facie* case on this element.

### ii. Similarly Situated Employees

When considering whether an employee is "similarly situated," the Court looks to whether they "dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992). Because each factor does not apply in every case, the Court must "look at those factors relevant to the factual context, as opposed to a requirement that a plaintiff demonstrate similarity in all respects." *Jackson v. FedEx Corp. Services, Inc.*, 518 F.3d

388, 394 (6th Cir. 2008). "In the disciplinary context, employees are 'similarly situated' only if they have 'engaged in acts of comparable seriousness.'" *Waggoner*, 682 F. App'x at 415 (quoting *Wright*, 455 F.3d at 710).

Lemieux has identified only a single similarly situated employee: Lawrence. LMG argues that Lemieux cannot show Lawrence was treated more favorably than Lemieux. [DE 36 at 478]. Lemieux responds that Lawrence was a similarly situated Senior Social Worker and was treated more favorably. [DE 35 at 452]. In some respects, Lawrence was similarly situated to Lemieux. In terms of her position, both Lawrence and Lemieux were Senior Social Workers, and both worked under the same supervisor, Williams. [DE 35-1 at 462–63]. Additionally, both Lawrence and Lemieux were placed on a PIP by Williams for missing deadlines, and both PIPs began around the same time. [*Id.* at 463; DE 26-21 at 214–18].

But the similarities end there. Most notably, Lawrence successfully completed her PIP and Lemieux did not. *See Marshall v. Wayne Cnty., Michigan*, No. 22-1499, 2023 WL 2707222, at *2 (6th Cir. Mar. 30, 2023) (holding sole comparable employee was not similarly situated because he responded differently to corrective action). That is true even though Lemieux was given extensions to complete her PIP. [DE 36 at 480]. Lemieux's first PIP also provided multiple deadlines—one at the end of August and one at the end of September—to break the tasks into smaller groups, but she still failed to complete the PIP. [DE 26-20 at 21]. If Lemieux had finished sixteen case files for each deadline, this would have helped her reach the ultimate goal of being completely caught up by the beginning of October. [DE 26-20 at 21]. The first deadline was even extended into mid-September, and Lemieux still did not reach it. [DE 36-2 at 487]

If Lemieux were able to show that Lawrence *also* struggled to complete her PIP, still failed to meet extended deadlines, and suffered from performance deficiencies of similar severity, this

would create a genuine dispute of material fact because Lawrence was not fired. But instead, Williams' testimony shows that Lawrence was placed on a PIP around August or September, after only experiencing issues since the "spring," and then she "got it together" and "made the adjustment." [DE 35-1 at 465]. Williams only seemed to suggest that Lawrence struggled generally with "timeliness," but did not specify other concerns that may or may not have existed. [DE 35-1 at 464]. The same cannot be said for Lemieux, whose continued struggles were thoroughly documented. Furthermore, Lemieux does not dispute that Lawrence completed her PIP and alleges no facts that show Lawrence had similar continuous performance issues after she was placed on a PIP. *See Rugiero v. Nationstar Mortg., LLC*, 580 F. App'x 376, 378 (6th Cir. 2014) (explaining "if a party fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion.") (quoting Fed. R. Civ. P. 56(e)(2)) (brackets and ellipses omitted).

The only potential difference the Court can identify between LMG's treatment of Lemieux and Lawrence is that Lawrence was put on a PIP prior to other disciplinary actions, while Lemieux was disciplined prior to being placed on a PIP. But Lemieux does not explain what meaning the Court should draw from this distinction. *See Marshall*, 2023 WL 2707222, at *3 ("The treatment of two employees need not be identical in every tiny detail."). For instance, Lemieux does not address whether a PIP is more serious than the disciplinary action taken against her prior to the first September PIP or explain why additional disciplinary action taken against Lemieux should mean Lawrence was treated *more favorably*. *See Waggoner*, 682 F. App'x at 415 ("Employees are not similarly situated if there are differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.") (citation and quotation marks omitted); *Marotta v. Ford Motor Co.*, 119 F. Supp. 3d 676, 694–95 (E.D. Mich. 2015) (holding

employee was not "similarly situated" when circumstances justified different treatment). It is plausible that Lawrence was only placed on a PIP without additional disciplinary action because she corrected course, or because her performance deficiencies were less severe than Lemieux. While it does appear that Lemieux was subjected to *more* disciplinary action than Lawrence, Lemieux simply does not explain why this means Lawrence was treated *more favorably*. *See Mitchell*, 964 F.2d at 583 (explaining employees must "have engaged in the same conduct without such differentiating or mitigating circumstances that would *distinguish their conduct or the employer's treatment of them for it*") (emphasis added). It is just as likely that Lawrence simply responded better to the PIP or had fewer underlying performance issues warranting discipline. Indeed, Williams' deposition testimony—the only portion of the record that speaks to Lawrence's performance—seems to reveal that Lawrence's PIP resulted from a collaborative conversation between Williams and Lawrence:

> So, like, Sherry [Lawrence], for example, she had been struggling with her timeliness it seemed like since the spring, and Laura [Winfrey] was working with her and working with her; and I remember -- you know, I do walk-around management. I remember goin' and sittin' on her desk and, you know, "Hey, what's goin' on?" I don't know. Maybe she was depressed, was a little melancholy, but her response to me, "I just don't have any energy"; right? So, we talked about self-care. We talked about balance in life. She decided she needed more direction; so, we put her on a Performance Improvement Plan and she got it together. She was able to make the adjustment and was, you know, successful.

[DE 35-1 at 465]. Regardless, both employees were given an opportunity to complete a PIP, but only Lawrence succeeded. Therefore, although Lemieux was fired and Lawrence was not, they were not similarly situated as it relates to their response to disciplinary proceedings, and Lemieux has not shown Lawrence was treated more favorably. *See Marshall*, 2023 WL 2707222, at *2 ("Because [supervisor] gave [both employees] the chance to remedy their errors, this attempt to establish disparate treatment fails too.").

Additionally, the fact that Lemieux was making some progress with her PIPs does not show that she was treated less favorably than Lawrence. While Lemieux may have made some progress, she never alleges that she *completed* a PIP, as Lawrence did. Instead, Lemieux lists off a series of explanations for being unable to complete the PIP—that the Senior Social Worker's operating procedures were "in a state of flux," that there was supposedly "grace" in the system around this time that she did not receive, and that Lemieux was "not given the same opportunity" as Lawrence to complete her PIP before being disciplined. [DE 35 at 452]. Later in her supplemental response, albeit while arguing "pretext," [2] Lemieux also points out that Winfrey did not meet with her on many of the scheduled dates for a one-on-one meeting. [DE 35 at 454]. But even assuming all of this were true, it would not distinguish LMG's treatment of Lawrence from Lemieux. Presumably, the operating procedures' "state of flux" and the "grace" in the system affected Lawrence as well.[3] And Lemieux does not set forth any facts that demonstrate Lawrence was also failing to complete her PIP or had similar levels of performance deficiencies. In other words, while Lemieux may point to some differences between LMG's treatment of herself and Lawrence, she provides the Court no basis to conclude Lawrence was treated more favorably than her; therefore, these differences are not material. *See Liberty Lobby*, 711 U.S. at 248 ("the requirement is that there be no *genuine* issue of *material* fact" and "the substantive law will identify which facts are material,"

---

[2] Lemieux expends over three pages discussing pretext (the third *McDonnell-Douglas* step), arguing that "to the extent that LMG" has articulated a non-discriminatory reason for treating Lemieux differently, that reason "did not actually motivate the termination and/or it was insufficient to warrant the termination." [DE 35 at 453]. The Court need not consider this argument because Lemieux has not established a *prima facie* case. Nor does LMG explicitly argue a non-discriminatory purpose, asserting only that Lemieux did not establish a *prima facie* case because she cannot show Lawrence was treated more favorably than Lemieux.

[3] Williams' testimony seems to show that the "grace in the system" was offered until July, when it was made clear that all social workers should be on track. [DE 35-1 at 465 ("[W]hen we got to that July date that we sat down and everybody's like, 'Okay. Yeah. We get it,' no questions, then we need to get it; right?")]. But she also reiterated that there was "nothing new" once the committee had completed its work. [*Id.*]. Both Lawrence and Lemieux would have been subject to this change because both of their PIPs began after July in August or September.

meaning that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.") (emphasis in original).

Lemieux has not created a genuine dispute of material fact that Lawrence was a similarly situated employee treated more favorably than her. While Lawrence and Lemieux both worked the same job and were both placed on a PIP around the same time, Lawrence succeeded on her PIP, while Lemieux did not. Moreover, Lemieux does not provide any details about Lawrence's job performance, disciplinary record, or employment with LMG outside of Williams' deposition testimony. As a result, Lemieux has not established this element of her *prima facie* case, and LMG is entitled to summary judgment. *Cox v. Elec. Data Sys. Corp.*, 751 F. Supp. 680, 692 (E.D. Mich. 1990) ("Where a plaintiff cannot establish that employees whom he/she contends were treated differently were similarly situated in all respects, summary judgment is proper.") (citation omitted).

### III. Conclusion

For the reasons explained, and the Court being otherwise sufficiently advised, LMG's motion for summary judgment on Lemieux's disparate treatment claim [DE 26] is **GRANTED**.

Rebecca Grady Jennings, District Judge
United States District Court

December 15, 2023

cc: counsel of record